Field *v.* Golden Triangle Broadcasting, Inc., Appellant.

Argued September 28, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

reargument refused June 20, 1973.

*John A. Metz, Jr.,* with him *Metz, Cook, Hanna & Kelly,* for appellant.

*S. Gordon Elkins,* with him *Stradley, Ronon, Stevens & Young,* for appellee.

Opinion by Mr. Justice Nix, May 4, 1973:

The main issue in this appeal is whether an August 14, 1968 letter agreement, executed by the appellee, Joseph M. Field, and by Myron Jones as president and virtually sole stockholder of the appellant, Golden Triangle Broadcasting, Inc., is an enforceable contract. Appellant contends that even though the writing involved is in form an offer and acceptance, its qualifying words are such that it can be construed merely as an arrangement of terms in contemplation of the parties future agreement on a formal contract.

The facts as found by the chancellor and approved by the court en banc insofar as they are relevant to this appeal are as follows: Appellee is an individual residing in the City of Philadelphia and appellant, Golden Triangle Broadcasting, Inc. [hereinafter cited as Triangle], is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania. Triangle is a closely held corporation, whose assets consist solely of radio stations WEEP and WEEP-FM in Pittsburgh, Pennsylvania. Myron Jones is, and at all relevant times has been, the president and chief executive officer of Triangle and is the owner of 597 of its 600 authorized and outstanding shares.

During the first half of 1968, appellant, through Jones, was endeavoring to find a satisfactory purchaser for its radio stations and had negotiated with various possible purchasers including appellee Field, through Blackburn & Co., a media broker in Washington, D.C. On or about August 14, 1968, Jack Harvey of Blackburn & Co. arranged a meeting between Field and Jones in Pittsburgh for the evening of August 14, 1968. In advance of the meeting, Harvey prepared a typewritten letter agreement dated August 14, 1968, which he brought with him to the meeting. At the meeting the purchase of radio stations WEEP and WEEP-FM

by Field was discussed and during this discussion, various pen and ink changes were made by Harvey in the text of the typewritten letter agreement and the changes were initialled by Field and Jones. In the early morning hours of August 15, 1968, the parties visited the facilities of the radio stations and after viewing the premises, Field signed the letter and Jones signed the acceptance for the appellant.

On August 15, 1968, Field and Jones resolved which of their attorneys should proceed with the preparation of a formal contract containing the terms and provisions of the letter agreement accepted by them. At the same time Field advised Jones that he was not going to use an existing corporation to complete the purchase but rather would form a new corporation.[1] On August 19, 1968, Field sent to Blackburn & Co. his check for $10,000.00 as a deposit pursuant to the terms of the letter agreement. This check was never cashed by the appellant.

On October 11, 1968, after the parties exchanged several documents in preparation for closing the sale, appellant's attorney sent Field's attorney a letter stating that the proposed corporate setup of Field's new corporation, which was going to make the purchase, was completely unsatisfactory to Triangle from a security standpoint. This letter also set forth guidelines as to five minimum requirements that would be satisfactory to Jones. Approximately two weeks later, Field submitted to the appellant the final corporate informa-

---

[1] The letter agreement specifically stated that Field was making the offer to purchase on behalf of a corporation, either in existence or to be formed, in which he was or would be a stockholder and that Field had the right to assign all of his rights and obligations to such corporation. The letter agreement further specified what security a newly formed corporation would have to provide if such a corporation were to become the buyer.

tion with reference to the corporation he was willing to set up for the purpose of making the purchase. Finally, on November 1, 1968, Jones wrote to Field and stated that since Triangle's minimum security safeguard had not been fulfilled, Triangle would not enter into a formal binding contract for the sale of the properties to Field or his proposed corporation.

Subsequently, Field filed a complaint in equity against appellant for specific performance of the August 14, 1968 letter agreement. The chancellor below found that this writing constituted an enforceable contract and therefore decreed that Triangle convey radio stations WEEP and WEEP-FM to Field. The court en banc dismissed Triangle's exceptions and affirmed the chancellor's findings. From the final decree thus entered, this appeal followed.

Initially, we note that when the evidence is conflicting as to whether the parties intended that a particular writing would constitute a complete expression of their agreement it has been held that it is a question of fact for the trier of fact to determine whether a contract exists. *See Associated Hardware Supply Co. v. Big Wheel Distributing Co.,* 355 F. 2d 114 (3d Cir. 1966); *Melo-Sonics Corporation v. Cropp,* 342 F. 2d 856 (3d Cir. 1965); *Goldman v. McShain,* 432 Pa. 61, 247 A. 2d 455 (1968); *see also Building Mart, Inc. v. Allison Steel Manufacturing,* 380 F. 2d 196 (10th Cir. 1967); 3 CORBIN CONTRACTS §§554, 595 (1960). Since the chancellor found that the letter agreement of August 14, 1968 was intended by the parties to be a valid, binding contract, we will not reverse his finding: "unless it appears that he has clearly abused his discretion or committed an error of law [citing cases] and . . . the findings have the full force of a jury verdict and, if supported by sufficient evidence and if affirmed by the court en banc, will not be disturbed on appeal (Girard

Trust Bank v. Sweeney, 426 Pa. 324, 231 A. 2d 407 (1967)). As we stated in Masciantonio Will, 392 Pa. 362, 367, 114 A. 2d 362 (1958), 'The test is not whether we, the appellate court, would have reached the same result had we been acting as the hearing judge who saw and heard the witness, "but rather whether a judicial mind, on due consideration of the evidence, as a whole, could reasonably have reached the conclusion of the chancellor." ' " Yuhas v. Schmidt, 434 Pa. 447, 453-54, 258 A. 2d 616, 619-20 (1969). See Baldassarre v. Rare Metals Derivatives, Inc., 444 Pa. 100, 282 A. 2d 262 (1971).

An examination of the record before us discloses ample evidence from which the chancellor could properly have concluded that the parties intended the letter agreement of August 14, 1968 to be a binding contract. At trial it was clearly established that in the Spring of 1968, Triangle had engaged Blackburn & Co. to obtain a purchaser for the radio stations. After another interested party made an offer below Jones' original quotations and also imposed a contingency upon the offer, Blackburn & Co.'s representative, Harvey, suggested that Jones meet with Field who had made three previous oral offers which were rejected in early August, 1968. Harvey's testimony concerning the meeting shows that he called Field and said Jones would meet with him in Pittsburgh. Harvey further testified that he then advised Jones that Field was coming to Pittsburgh to meet with him on the basis that they would either make a deal or have no further discussions and Jones replied: "That's fine. I would like to get it over with or not. I would like to wind it up tonight."

When Field arrived in Pittsburgh, he reiterated that he had come to Pittsburgh either to enter into a binding contract or terminate negotiations. Thereafter, the parties read and discussed the terms of the proposal

and certain changes and/or additions were written in by Harvey. After inspecting the radio station facilities, the parties signed the letter agreement, carefully initialing every change. We agree with the chancellor's conclusion that "[a]n examination of the document would indicate it embodied the essential terms to constitute a binding contract. It covers the purchase price, the downpayment to be made, the security to be given, a description of the assets to be sold, and numerous other details usually contained in contracts."[2]

Appellant, however, contends that on its face the August 14, 1968 letter agreement shows that it was not a complete agreement but was merely an arrangement of terms in contemplation of agreement on a formal contract. The language upon which appellant bases this conclusion is the following:

The opening sentence of the letter, which states: *"Subject to agreement on a formal contract* containing

---

[2] As alleged in appellee's brief: "An examination of the instant Agreement makes it clear that all essential terms are covered. The purchase price is clearly stated, including the amount down, the amount to be paid at closing, and the subsequent installments. Buyer is given a prepayment right. An interest provision is included. Liquidated damages are provided for if buyer defaults. Security is specified, including a mortgage on all assets, and the pledge of the acquiring corporation's stock or, if an existing corporation's stock cannot be pledged, providing some option to the seller not to proceed. The assets being sold are described. There are provisions concerning a lease of the present site, the monthly rental, the period, the option to renew, and the meaning of a 'net' lease. Responsibility for sellers' accounts receivable and accounts payable are described in detail. There are provisions concerning an FCC construction permit and transmittal site. Buyer agrees to assume the contractual obligations of the radio stations being purchased, and the parties agree too that seller will pay the broker's commission. The Agreement further states that plaintiff is making the offer on behalf of a corporation in existence or to be formed, and that plaintiff's rights in the agreement are assignable to it. The Agreement further allocates the consideration." Brief for Appellee at 17-18.

the provisions hereinafter set forth. . . ." (Emphasis added.)

Paragraph 1(a), which provides: "We will pay $175,000 cash at closing. Of this amount, $25,000 will be placed in escrow *at the time of signing a formal contract*. . . ." (Emphasis added.)

On the bottom of page 1 of the letter, where it is provided: "If an existing corporation becomes the Buyer and if its stock cannot be so pledged, Seller shall have the right to examine such buying corporation's balance sheet *prior to execution of a formal contract* and, if such balance sheet is not satisfactory to him, shall then have the right to void this entire transaction." (Emphasis added.)

The language on the last page, which states: "As evidence of our good faith, we attach herewith our check in the amount of $10,000 made payable to Blackburn & Co., Inc. *If this offer is accepted and a formal contract is agreed to,* this amount will become part of the escrow payment mentioned above. *If this offer is not accepted or if a formal contract is not agreed to,* this check will be returned to us without any obligation." (Emphasis added.)

Basically, it is Triangle's position that there is no reasonable construction which can be given this language which would not result in the conclusion that the parties were not to be bound by the mere offer and acceptance embodied in the writing but, on the contrary were to become bound only when they thereafter agreed to a formal contract. However, as stated above, we believe the chancellor had ample justification in concluding that the letter agreement itself, by its terms, formality and the extraordinary care in its execution, indicates that the signatories intended to bind themselves to an enforceable contract.

Moreover, "it is well-settled in Pennsylvania that where the parties have settled upon the essential terms and the only remaining act to be done is the formalization of the agreement, the latter is not inconsistent with the present contract. . . ." *Melo-Sonics Corporation v. Cropp,* 342 F. 2d 856, 859-60 (3d Cir. 1965). Similarly, as this Court noted in *Goldman v. McShain,* 432 Pa. 61, 69, 247 A. 2d 455, 459 (1968) : "Section 26 of the Restatement of Contracts specifically recognizes that parties may bind themselves contractually although they intend, at some later date, to draft a more formal document: 'Mutual manifestations of assent that are in themselves sufficient to make a contract will not be prevented from so operating by the mere fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; . . .' Restatement, Contracts §26." *See Moudy v. West Virginia Pulp & Paper Company,* 385 Pa. 39, 121 A. 2d 881 (1956) ; *Taylor v. Stanley Co. of America,* 305 Pa. 546, 158 A. 157 (1932).

Appellant also argues that the August 14, 1968 letter agreement cannot be construed as an enforceable contract since it omits many material provisions of importance to both parties. Specifically, appellant places much weight on the fact that the agreement does not specify a closing date.[3] However, we have consistently held that "where no time for performance is provided in the written instrument the law implies that it shall be done within a reasonable time . . ." depending upon

---

[3] The time of closing controls: (1) The payment of the balance of the cash consideration; (2) The time when the payment of the installment obligations begins; (3) The beginning of the term for the 10 year lease of the transmitter site and the rent payable thereunder; (4) The beginning of the 90 day period in which the Buyer is to collect Seller's accounts receivable for Seller; and (5) The payment of that portion of the purchase price attributable to the 50 kilowatt construction permit and transmitter.

the nature of the business. *Lefkowitz v. Hummel Furniture Co.,* 385 Pa. 244, 247, 122 A. 2d 802, 804 (1956). See *L.C.S. Colliery, Inc. v. Globe Coal Co.,* 369 Pa. 1, 84 A. 2d 776 (1951) ; *Marshall Construction Co. v. Forsyth,* 359 Pa. 8, 57 A. 2d 902 (1948) ; *Orlowski v. Moore,* 198 Pa. Superior Ct. 360, 181 A. 2d 692 (1962). Furthermore, the letter agreement was subject to the approval of the Federal Communications Commission and since no one could predict when the commission would act, it was not possible to set a specific date for closing.

Appellant also urges that "many other" material terms and conditions that are customarily included in a contract for sale of a going concern are absent from the August 14, 1968 letter agreement.[4] However, the fact that additional provisions would enhance the position of both parties is not controlling. What is necessary is that the parties agree to all the essential terms and intend the letter to be binding upon them. We believe that the letter agreement in question manifests such agreement and intention.

Appellant further submits that the letter of August 14, 1968 was not a final agreement because it calls for an inventory of the assets being purchased[5] and the assumption of the contract obligations of the stations only

---

[4] Besides the lack of a closing date, three other omissions are specifically mentioned: (1) The parties did not specify a deadline for obtaining Federal Communications Commission approval; (2) The August 14, 1968 letter did not contain a provision for the furnishing and warranting by Triangle of financial statements; and (3) There was no mention of covenants pertaining to the operation of the business pending the closing of the transaction.

[5] Clause 2 of the letter agreement provides: "2. It is understood and agreed that all of the assets of said radio stations, except for the land at the present transmitter site and cash and accounts receivable, are to be delivered free and clear of any and all liens and encumbrances. An inventory of the assets to be delivered will be prepared and will become a part of the formal contract."

after Field reviews and approves them.[6]  We find no merit in this contention, since these provisions merely provide Field with the opportunity to ascertain whether the contractual obligations are indeed normal and whether the assets are in proper order.  Such post-agreement inventories before final closing are standard practice.  The essential factor is that the agreement specifies the categories of assets being purchased and the types of obligations being undertaken.

Similarly, the agreement is not unenforceable, as appellant suggests, because it provides that the purchase of a 50 kilowatt transmitter is subject to Field's prior inspection and approval.  With respect to the purchase of this transmitter, it is clear that the parties contemplated a separate transaction which would not affect the validity of the remainder of the agreement.

We cannot accept Triangle's assertion that it would be unconscionable for a court to enforce the agreement due to the hardship it may cause appellant.  Essentially, appellant argues that no reasonable seller would have agreed to sell the radio stations to a corporation where the "only security" for the $475,000.00 installment obligation of the total purchase price of $650,-000.00 was a mortgage on the assets and a pledge of the buyer's stock.  However, from the record before us it is clear that Myron Jones did so agree and only after an extended discussion of the subject.  An individual cannot subsequently contend that he is entitled to further security beyond what he originally agreed.  As Mr.

---

[6] Clause 8 of the letter agreement provides: "8. Buyer agrees to assume all of the contractual obligations of said stations which are usual and normal to its operation, such as a studio-office lease, music licensing agreements, news service contracts, and the like, provided however that all such agreements to be assumed are first made available to Buyer for inspection and approval. A list of all such contracts to be assumed will be prepared and will become a part of the formal contract."

Chief Justice [then Justice] Jones has stated in an analogous context: "The law demands of every man who bargains with another that he should do so only after due reflection of the possible consequences of his bargain and if he misjudges consequences that could have been expected by a reasonably intelligent man, he cannot rely on the law to remedy his fecklessness. Absent some legally recognized infringement of the law of contract by one party, the law will not reform a written contract so as to make a contract for the parties that they did not make between themselves and certainly never to rescue a party who did not reasonably foresee the consequences of his bargain." *New Charter Coal Co. v. McKee*, 411 Pa. 307, 312, 191 A. 2d 830, 833 (1963). Furthermore, we agree with the chancellor that the agreement provides for adequate security. The value of the tangible assets is secured by a mortgage. The value of the intangible assets is secured by a pledge of the stock of the corporation which owns them. These terms are clearly those intended by the parties during armslength bargaining and we will not now allow one of the parties to complain.

In the alternative, appellant argues that even if the writing of August 14, 1968 is a binding contract, Triangle acted within its legal rights under the Uniform Commercial Code [hereinafter cited as UCC] in demanding additional security assurances and in refusing to execute a formal contract without receiving the same.[7] This contention is based upon the provisions

---

[7] By letter dated October 11, 1968, appellant's attorney demanded the following security assurances:

Either

1. (a) the new corporation have paid-in capital of $500,000.00; and

   (b) the corporation have no other business interests; and

   (c) the corporation's stock be pledged as security; and

of Article 2 of the UCC,[8] which applies to the sale of goods. Insofar as is relevant here "goods" are defined in section 2-105(1) of the UCC as "all things which are movable". 12A P.S. §105(1). Sections 2-210 and 2-609 of the UCC, 12A P.S. §§2-210, 2-609, provide that where one of the parties to a contract for the sale of goods either assigns his rights and duties to another or impairs the other party's reasonable expectation of receiving due performance, the other party may demand adequate assurance that the contract will be performed, and the failure to provide such assurance is a repudiation of the contract.

Triangle seeks to apply these provisions of the UCC to the instant case and claims that "reasonable grounds for insecurity" were created since the August 14, 1968 letter agreement provided that Field had the right to assign all of his rights and obligations under the contract to a corporation to be formed and Field notified Jones that a new corporation would be formed to purchase the radio stations. We do not believe that Article 2 of the UCC applies to the instant contract. Rather than being an agreement for the sale of "goods", this is a contract for the sale of the businesses of two radio stations, including their tangible and intangible assets, as a going concern. Although this is a case of first impression in Pennsylvania, the Court of Appeals for the Tenth Circuit was presented with a situation similar to the issue before us in *Foster v. Colorado Radio Corporation*, 381 F. 2d 222 (10th Cir. 1967).

(d) there be a first mortgage on the assets, as security; and
(e) Field and his associates give personal endorsements; Or, alternatively
2. Buyer pay $635,000.00 in cash.
[8] Act of April 6, 1953, P. L. 3, §2-101, *as amended*, 12A P.S. §2-101.

There the court held, and we agree, that "the license, goodwill, real estate, studios and transmission equipment [of a radio station] were not movables and hence not 'goods' within the meaning of . . . [the UCC]." 381 F. 2d at 225-26.

We are aware that the *Foster* court went on to hold that the remaining assets sold under the contract, i.e., office equipment and furnishings, were movables. Here, however, the $30,000.00 of physical assets[9] are of little significance to either party when separated from the contract for the sale of the radio businesses and, therefore, we find no reason to view the August 14, 1968 letter agreement as two contracts. We believe that the nature of the transaction, the intention of the parties as reflected by the writing, and the lack of specific reference to designated assets renders inescapable the conclusion that the letter agreement was one integrated contract.

Even assuming that there were two separate transactions, one effecting the sale of "goods" and the other the sale of all remaining assets, appellant's reliance upon sections 2-210 and 2-609 of the UCC as justification for refusing to execute a formal contract is misplaced. First, this is not the situation contemplated under section 2-210 whereby a party contracts for performance by one individual, expecting him to perform, and thereafter discovers that a second individual, an assignee, will perform. As indicated by the chancellor below:

"[T]he letter agreement makes it clear that the parties, at the time the *agreement was executed, knew Mr. Field was going to assign his rights.* The agreement states: 'It is understood that the undersigned is

---

[9] This figure represents approximately 4.6% of the total purchase price of $650,000.00 and includes the value of such non-movables as towers and fences.

making this offer on behalf of a corporation, either in existence or to be formed, in which he is or will be a stockholder, and that the undersigned has the right to assign all of his rights and obligations under this offer to such corporation.' Thus, the parties knew when the agreement was signed that Field was not going to be the performing party but that a corporation would perform. Moreover, the letter agreement specifically provided for the security which the assignee corporation was to provide. The last paragraph of the first page of the letter agreement states that the buyer's note will be secured by a mortgage on all the assets delivered and the pledge of all of the stock of the newly formed acquiring corporation. Where an agreement, even for the 'sale of goods', expressly states the security which the assignee will provide, the seller cannot later contend that he is entitled to further security beyond what he originally agreed to. The letter agreement provides for adequate security which the plaintiff has always been willing to provide." (Emphasis in original.)

Furthermore, we have already indicated that the security which is provided for the entire contract is adequate. Therefore, it follows that the security for that part of the contract which is for the sale of "goods" is similarly adequate. Clearly, where adequate assurance of performance is already present, and there has been no change in circumstances to give rise to reasonable grounds for insecurity, a demand for additional security under section 2-609 is not justified.

Finally, appellant argues that even if the August 14, 1968 letter agreement is a contract, specific performance is an entirely inappropriate remedy under the circumstances of the instant case. Triangle first contends that the contract is too vague to be specifically enforced. While we agree that it is fundamental law that a decree of specific performance will not be granted unless

the agreement to be enforced is complete and certain, *see, e.g., Pierro v. Pierro,* 438 Pa. 119, 264 A. 2d 692 (1970); *Portnoy v. Brown,* 430 Pa. 401, 243 A. 2d 444 (1968); *Berberich v. Berberich,* 383 Pa. 349, 118 A. 2d 445 (1955); *Cheney v. Carver,* 370 Pa. 543, 88 A. 2d 746 (1952), we have already determined that the writing in question is complete and that it encompasses all the essential terms of the bargain.

Appellant also argues that the remedy of specific performance is inappropriate because the granting of such remedy would place the parties in an "impossible position" due to the changes which have occurred during the pendency of this litigation. Briefly, appellant's argument is as follows: The letter agreement of August 14, 1968 specifically referred to the transfer of seller's FCC construction permit to increase the power of WEEP radio station to 50,000 watts and the purchase of Triangle's 50 kilowatt transmitter. Subsequently, after this litigation commenced and pursuant to this permit appellant proceeded to construct a new 50 kilowatt facility. Since both parties agreed that the appellee was not entitled to gratuitously receive the newly constructed facility, the court below decreed specific performance of the remainder of the agreement without reference to the transmitter site. Appellant argues that this decree places the parties in an impossible situation because it results in a division of the two facilities and the licenses to operate them. This, Triangle submits, leaves it without an auxiliary transmitter and gives appellee a 50 kilowatt facility which he does not own.

We agree that the construction of the new transmission facility affects the value of the contract. However, construction of the facility was undertaken by Triangle with full knowledge that Field was seeking specific performance of the contract. In effect, after

unilaterally creating an expensive facility not covered by the agreement, Triangle is now alleging that an oppressive situation exists which makes specific performance inequitable. This Court will not refuse specific performance against a party who, by its own questionable conduct has attempted to make performance of the contract impossible.

In determining that specific performance should be decreed, justice forces us to take into account the enhanced value of the bargain due to the new facility. Contrary to the lower court's decree, we do not deem it proper to separate this transmitter from the rest of the stations' assets since it is obvious that the 50 kilowatt transmitter is an integral part of radio station WEEP. However, rather than allowing appellee to gratuitously benefit from the improved facilities, we believe that the equities of the situation require that appellant be reimbursed for the cost of the new facility.[10] Therefore, the granting of specific performance as to the auxiliary transmitter is conditioned upon payment to Triangle of an amount equal to the actual expenses incurred in constructing the new 50 kilowatt facility. Accordingly, the case must be remanded to the court below to receive testimony and establish the amount that was expended by Triangle in the construction of this facility.

Decree modified and case remanded for further proceedings consistent with this opinion. Each party to bear own costs.

Mr. Chief Justice JONES concurs in the result.

---

[10] Whether a seller should be allowed to be reimbursed for improvements made by him to the property depends upon the equity of the particular situation. When the circumstances of the case have required it, courts have conditioned decrees upon payment for improvements. *Compare Fitzpatrick v. Allied Contracting Company*, 24 Ill. 2d 448, 182 N.E. 2d 183 (1962) *with Coppom v. Humphreys*, 171 Colo. 410, 467 P. 2d 816 (1970). *See also Calbreath v. Borchert*, 248 Iowa 491, 81 N.W. 2d 433 (1957) ; Annot., 7 A.L.R. 2d 1205.