445 A.2d 1288

**COURIER TIMES, INC., Calkins Newspapers, Incorporated and Burlington Times, Inc.,**

v.

**UNITED FEATURE SYNDICATE, INC., Appellant in No. 501,**

**and**

**Philadelphia Newspapers, Inc., Appellants in No. 523**

**and**

**Eugene L. Roberts, Jr.**

Superior Court of Pennsylvania.

Argued March 10, 1982.

Filed May 21, 1982.

Phillip A. Proger, Washington, D. C., and Stephen Wales Armstrong, Philadelphia, for appellant (at No. 501) and for appellee (at No. 523).

Gregory M. Harvey, Philadelphia, for Courier, et al., appellees.

Samuel E. Klein, Philadelphia, for Philadelphia Newspapers, appellant (at No. 523) and for appellee (at No. 501).

Before WICKERSHAM, CIRILLO and LIPEZ, JJ.

LIPEZ, Judge:

This appeal is from an order granting a preliminary injunction [1], which decrees that, pending the outcome of the three plaintiff newspapers' request for a permanent injunction, defendant United Feature Syndicate, Inc. (United) must specifically perform an alleged one-year oral contract permitting the plaintiff newspapers to publish the popular comic strip, "Peanuts." Separate appeals were filed by United and by defendant Philadelphia Newspapers, Inc. (the Inquirer),[2] which claimed it had exclusive rights to "Peanuts" on the basis of a written contract with United. The

---

[1] Although interlocutory, the order is appealable under Pennsylvania Rule of Appellate Procedure 311(a)(4), effective April 22, 1979. 8 Pa.Bull. 3636, 3637 (1978); *see Fischer v. Department of Public Welfare*, 497 Pa. 267, 270 n.2, 439 A.2d 1172, 1174 n.2 (1982).

[2] The Inquirer was made a defendant along with United, but the chancellor denied the request for a preliminary injunction as to the Inquirer, and granted it only as to United. The Inquirer nonetheless has the right to appeal the order, however, because the effect of granting the preliminary injunction against United is to deprive the Inquirer of its claimed contract right to exclusivity in publishing "Peanuts" within its circulation area. The Inquirer is therefore a "party who is aggrieved" by the order under Pennsylvania Rule of Appellate Procedure 501. *Cf. English v. Lehigh County Authority*, 286 Pa.Super.Ct. 312, 334, 428 A.2d 1343, 1355 (1981), *rearg. den'd., petition for allowance of appeal granted; Tripps Park Civic Association v. Pennsylvania Public Utility Commission*, 52 Pa.Commw.Ct. 317, 321–22, 415 A.2d 967, 970 (1980); *see also Application of El Rancho Grande, Inc.*, 496 Pa. 496, 501–02, 437 A.2d 1150, 1153 (1981).

two appeals were consolidated,[3] and expedited argument[4] was held before this panel on March 10, 1982.[5] We affirm.

The findings of the chancellor, Judge William Hart Rufe, III, provide an excellent summary of the pertinent facts:

1.   Plaintiff, Courier Times, Inc. is a daily and Sunday newspaper with a daily circulation as of January 27, 1982 of approximately 65,000 located primarily in the area of lower Bucks County.

2.   Plaintiff, Calkins Newspapers, Incorporated, publishes the Doylestown Daily Intelligencer, a daily and Sunday newspaper with a daily circulation as of January 27, 1982 of approximately 28,000 located primarily in the area of central Bucks County.

3.   Plaintiff, Burlington Times, Inc. is a daily and Sunday newspaper with a daily circulation as of January 27, 1982 of approximately 42,000 located primarily in the area of Willingboro and Burlington County, New Jersey.

4.   John J. Carroll is the "Senior Vice President-Sales" for United, having been employed by United for over forty years.   He worked as a salesman for United until 1972, when he became Sales Manager, which position he retained until 1979 when he was elevated to Senior Vice President-Sales.   Only the president of United, one Robert Metz, is higher in the corporate structure of United than Mr. Carroll. There are also two Vice Presidents of United: David Hendin, Vice President-Editorial Director;  and Sid Goldberg, Vice President-Managing Editor and Comics Editor.

5.   As Senior Vice President-Sales, Mr. Carroll's duties included calling on major newspapers across the country, such as the two Philadelphia papers, the Inquirer and Bulletin, the Chicago Tribune, the Chicago Sun Times, The San Francisco Chronicle, the San Francisco Examiner and the San Jose Mercury.   In October, 1981 his territory was reduced to the states of New Jersey and Pennsylvania.   No

**3.**   *See* Pa.R.A.P. 513.

**4.**   *See* Pa.R.A.P. 2313.

**5.**   Requests for a stay of the order granting the preliminary injunction were denied both by the chancellor and by Judge Spaeth of this court.

reason was given for this reduction, but we note Mr. Carroll lives in Edison, New Jersey, and he is approximately 64 years of age.

6. As Senior Vice President-Sales for United, Mr. Carroll also represented United at many trade shows and industry conventions across the country and served as United's representative to the Comics Council, a national organization of syndicate representatives and editors responsible for comics. We accept as completely credible, and find as fact, Mr. Carroll's own self-assessment that he is one of the most experienced persons in this line of work in the entire United States.

7. As Sales Manager and as Senior Vice President-Sales, Mr. Carroll signed many contracts on behalf of United. Exhibits P–16 through P–23. Mr. Carroll testified that he does not *presently* have authority to sign contracts for United. However, he also testified that Mr. Metz instructed him on January 29, 1982 not to participate any further in the sale of "Peanuts" in the Philadelphia market. There is no other evidence whatsoever of any limitation on Mr. Carroll's authority representing United. Therefore, we find as fact that Mr. Carroll did have *actual* authority to represent and contractually bind United as of January 27, 1982 and any limitation on that authority, if any, did not exist prior to January 29, 1982.

8. No notice of any kind, written or otherwise, was ever transmitted or communicated to any of the clients or customers of United giving notice of any limitation in Mr. Carroll's authority. Mr. Carroll, in his forty years with United, never made a contract or agreement with a client or customer of United that was not accepted, approved and honored by United. Mr. Carroll knew and dealt with Mr. Sandy Oppenheimer, editor of the Courier, for twenty years, made agreements for publishing United features and comics in the Courier, and signed contracts confirming such agreements during that period. No notice of any limitation of Mr. Carroll's authority to act on behalf of United was ever transmitted or communicated to Mr. Oppenheimer. We find

that Mr. Carroll had *apparent* authority, as well as *actual* authority to represent and contractually bind United on January 27, 1982.

9. Mr. Carroll and Mr. David Hendin, Vice President-Editorial Director for United, both testified to the procedure by which agreements are made between United and a newspaper publisher. When a United salesman and the newspaper publisher agree on the terms of the sale of a feature or comic the salesman calls New York immediately for approval. Assuming immediate approval, which apparently is the usual situation, the clerical staff is instructed to prepare written contracts forthwith, and if the salesman has the reproduction proofs with him as samples, he may leave them with the editor at that time. The editorial department of United immediately initiates the forwarding of continuing reproduction proofs to the newspaper. The written contracts are then forwarded to the newspaper for execution, and upon return are executed by United, whereupon one copy thereof is returned to the newspaper. This contract signing process may take a number of weeks during which time the newspaper will continue publishing the contracted for feature, invoices will be sent out by United, and payment made thereon, all based on the initial oral agreement. Occasionally, a newspaper will fail to return the executed contract, whereupon United eventually discontinues sending the reproduction proofs, and submits bills for all proofs previously sent but unpaid. Neither United employee testified to a single instance in which United failed to complete an executed contract returned to it by a newspaper, prior to the present case. Mr. Gary Andrews, managing editor of the Quakertown Free Press, another United customer, confirmed this procedure and testified that his newspaper was presently carrying four United features, one pursuant to a written contract and the other three pursuant to the initial oral agreement, although he anticipated receiving the written contracts for his execution eventually. We find as fact that contracts for the sale of features, cartoons and comics by United are initiated as oral contracts subsequently confirmed by written contracts.

10.  The written form of agreement used by United contains eight numbered paragraphs.  The first three, entitled "1. Service", "2. Rate", and "3. Term", all embody the provisions agreed upon by the newspaper and the United representative at the time of the initial oral agreement, and are the only provisions binding United beneficially to the newspaper.  The remaining five paragraphs, entitled, "4. Use", "5. Performance", "6. Assignment", "7. Default", and "8. Miscellaneous", all relate to protections for United and limitations on the newspapers use of the features, and all bind the newspaper beneficially to United.

11.  Paragraph 8 of the written agreement provides as follows:

"8.  Miscellaneous: Time as to notice of termination under Paragraph 3 and as to payments is of the essence. Oral representations or agreements *not embodied* in this Agreement are not binding, and this Agreement cannot be changed or terminated orally.  A waiver of any breach of, or right under, this Agreement shall not be construed as a waiver of any future breach or right.  This Agreement shall not be effective until accepted by UFS at New York, New York, and shall bind each party's successors and assigns."  (emphasis added)

We find as fact that the written form of agreement confirms, ratifies, and acknowledges prior oral agreements consistent with the terms contained in the written agreement.

12.  The effectiveness of the agreement as set forth in the last sentence of Paragraph 8, quoted above, is contingent upon acceptance by United in New York.  However, as both Mr. Carroll and Mr. Hendin testified, the oral provisions of the contract as to Service, Rate and Term, the only terms binding United beneficially to the newspaper, *are approved and accepted* in New York *before* the written contract is even prepared and forwarded to the newspaper, and before the reproduction proofs are delivered.  We find as fact that the act of forwarding the written agreement to the newspaper for execution, and the delivery of the reproduction proofs for publication, is in and of itself acceptance by

United of the oral provisions of the agreement, thus binding United to those terms, whether or not United subsequently executes the written agreement, which only has the effect thereafter of binding the newspaper.

13. David Hendin, Vice President-Editorial Director for United testified to the reason for urgency in initiating publication of features in a newspaper. A cartoonist or comic artist prepares a unique and separate cartoon or strip for each and every day. If United has not contracted for the sale of that cartoon or strip with a newspaper for that particular day, the income receipts for that particular cartoon or strip, and the consequent royalties to the artist, are virtually lost forever. Hence, United moves with dispatch, on the basis of the oral agreement only, to get the cartoon or the strip to the newspaper as quickly as possible, in order to initiate billing therefore on the earliest possible daily cartoon or strip. Of course, if the newspaper subsequently fails to execute the written agreement, which includes the copyright requirements, limits on United's liability, default for non-payment, and United's right to assign the agreement, United eventually discontinues honoring the oral agreement.

14. The cartoon strip "Peanuts", created by Charles Schulz, is the most popular comic strip that United now offers, and the most valuable licensing property that United owns. It is considered the most popular comic strip in the United States in that it appears in more newspapers nationally than any other comic strip. "Peanuts" characters such as Snoopy, Charlie Brown, Lucy and Linus are featured in dolls, toys, posters, television specials and generally have a very high identification factor. Mr. Oppenheimer testified that many readers read newspapers for the features only and therefore it is a great advantage to have good features. "Peanuts" is regarded as the most popular feature of all.

15. For approximately thirty years "Peanuts" appeared exclusively in the Philadelphia Bulletin, that newspaper having contracted with United for exclusivity in the complete Philadelphia area market which encompasses the circulation of all three plaintiffs.

16. On Wednesday, January 27, 1982 the Philadelphia Bulletin announced that it would cease publication after its final edition on Friday, January 29, 1982.

17. The cessation of publication of the Philadelphia Bulletin threw several hundred thousand subscribers onto the open market for remaining newspapers, including many thousands located in the overlapping circulation area of the plaintiffs and the defendant, Inquirer. A unique atmosphere of competition for those Bulletin subscribers was thus created, and quite obviously the ability or inability to continue a former Bulletin feature, particularly "Peanuts", the most popular feature of all, would weigh heavily in that competition.

18. On Wednesday, January 27, 1982, very shortly after learning of the scheduled demise of the Philadelphia Bulletin, John J. Carroll, Vice President-Sales for United called Sandy Oppenheimer, editor of the Courier and quoted "premium" specific terms of Service, Rate and Term for the non-exclusive sale of "Peanuts" to the Courier. The terms were accepted and agreed upon by Mr. Oppenheimer for the Courier.

19. On Wednesday, January 27, 1982 Mr. Carroll similarly called Sandra Bauers, Associate Editor of the Intelligencer, and similarly quoted the specific terms of Service, Rate and Term for the non-exclusive sale of "Peanuts" to the Intelligencer. The terms were accepted and agreed upon by Ms. Bauers for the Intelligencer.

20. On Wednesday, January 27, 1982 Mr. Carroll also similarly called Jean West, Features Editor of the Times and again, similarly quoted the specific terms of Service, Rate and Term for the non-exclusive sale of "Peanuts" to the Times. The terms were accepted and agreed upon by Mrs. West for the Times.

21. On Wednesday, January 27, 1982, immediately after the phone calls were completed and the contract terms agreed upon, Mr. Carroll dictated "sales forms" P–1, P–2 and P–4, directing the clerical staff in New York to prepare

and send contracts and process the sale of "Peanuts" to each of the three plaintiff newspapers. "Process the sale" is a direction to the staff to forward the reproduction proofs to the newspapers.

22. On Thursday morning, January 28, 1982, Mr. Carroll and Mr. Hendin met with Mr. Greenberg, the person in charge of purchasing features for the Inquirer. Mr. Greenberg, on behalf of the Inquirer, made a specific offer to purchase "Peanuts" on an exclusive basis. Mr. Carroll informed Mr. Greenberg that he had already sold "Peanuts" to the Calkins papers, which Mr. Greenberg considered to be a "glitch" to their desire for exclusive rights. Mr. Greenberg, Mr. Carroll and Mr. Hendin did not conclude any agreement at that time, as Mr. Greenberg said he would have to "take the situation upstairs, to higher authority."

23. On Friday, January 29, 1982, the clerical staff of United in New York prepared the contracts for the sale of "Peanuts" to each of the three plaintiff newspapers, and forwarded them with cover letters to the particular editors with whom Mr. Carroll had contracted. Also on Friday, January 29, 1982, the reproduction proofs for publication were delivered to the Times, which does the Sunday comics printing for all three Calkins newspapers.

24. Sometime on Friday, January 29, 1982, (the time was not specified), Mr. Carroll called Mr. Metz, the president of United, and informed him that he had sold "Peanuts" to the Calkins newspapers. Mr. Metz then told Mr. Carroll not to participate any further in the sale of "Peanuts" in the Philadelphia market.

25. On Saturday afternoon, January 30, 1982, Mr. Metz called Mr. Oppenheimer at this home and advised him that a mistake had been made, that United would not be able to honor the agreement made by Mr. Carroll, and that the Inquirer was going to get "Peanuts", not the Calkins' newspapers.

26. On Monday morning, February 1, 1982, all three contracts for the sale of "Peanuts" together with their cover

letters arrived on the desks of the editors with whom Mr. Carroll had contracted. Mr. Oppenheimer, on behalf of the Courier, and Charles P. Smith, publisher of the Intelligencer, on behalf of that paper, both executed and returned the contracts to United immediately. Mrs. West, on behalf of the Times, was out of her office on Monday and Tuesday, February 1 and 2, 1982, but signed and returned the contract to United upon her return Wednesday, February 3, 1982. The reproduction proofs also arrived at the Times on Monday morning, February 1, 1982.

27. On Monday afternoon, February 1, 1982, after the executed contracts had been sent back to United, Mr. Metz called Sandra Bauers and informed her that the Intelligencer would not be getting "Peanuts" because there had been "simultaneous negotiations", that he was sorry, but would try to make it up. However, he did not explain further.

28. On Wednesday, February 3, 1982, when Jean West returned to her office she had a memo to return a call to Mr. Metz. She returned the call, and a secretary at United took her name and phone number and said she would have Mr. Metz call back. However, he never did.

29. On February 8, 1982, United and the Inquirer completed a written agreement for the *exclusive* right to publish "Peanuts" in the Philadelphia area market, which for the purposes of this case, specifically included Bucks County, Pennsylvania, and Burlington County, New Jersey. Exhibit P–26. The agreement was to begin February 1, 1982 and run for five years. The amounts of the contract were withheld from the record by agreement of counsel as proprietary information, but the prior contract between United and the Philadelphia Bulletin (Exhibit P–16) for "Peanuts" was in a weekly amount more than eight times the aggregate weekly amount of the combined Calkins' newspapers contracts.

30. On February 9, 1982, plaintiffs brought this action for a preliminary injunction to require United to specifically

perform its agreements with the three plaintiff newspapers to publish "Peanuts".

(Footnotes omitted; emphasis in original.)

All parties agree "that on an appeal from the grant or denial of a preliminary injunction, we do not inquire into the merits of the controversy, but only examine the record to determine if there were any apparently reasonable grounds for the action of the court below. Only if it is plain that no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous or misapplied will we interfere with the decision of the Chancellor." *Roberts v. Board of Directors of School District of City of Scranton,* 462 Pa. 464, 469, 341 A.2d 475, 478 (1975) (citations omitted).[6]

All parties also agree with Judge Rufe that the criteria he was to follow are those which have been repeatedly stated by our Supreme Court:

> [T]he essential prerequisites for the issuance of a preliminary injunction are: first, that it is necessary to prevent immediate and irreparable harm which could not be compensated by damages; second, that greater injury would result by refusing it than by granting it; and third, that it properly restores the parties to their status as it existed immediately prior to the alleged wrongful conduct. *Alabama Binder & Chemical Corp. v. Pennsylvania Industrial Chemical Corp.,* [410 Pa. 214, 189 A.2d 180 (1963)]. Even more essential, however, is the determination that the activity sought to be restrained is actionable, and that the

**6.** Some of the more recent among the myriad of Supreme Court cases in accord with this standard are: *Fischer v. Department of Public Welfare,* 497 Pa. 267, 270, 439 A.2d 1172, 1174 (1982); *Hospital Association of Pennsylvania v. Commonwealth Department of Public Welfare,* 495 Pa. 225, 232, 433 A.2d 450, 454 (1981); *Mazzie v. Commonwealth,* 495 Pa. 128, 133, 432 A.2d 985, 988 (1981); *Valley Forge Historical Society v. Washington Memorial Chapel,* 493 Pa. 491, 500, 426 A.2d 1123, 1128 (1981); *Shanaman v. Yellow Cab Company of Philadelphia,* 491 Pa. 516, 519, 421 A.2d 664, 666 (1980); *Bell v. Thornburgh,* 491 Pa. 263, 267, 420 A.2d 443, 445 (1980); *Commonwealth v. Coward,* 489 Pa. 327, 340, 414 A.2d 91, 98 (1980); *compare Singzon v. Department of Public Welfare,* 496 Pa. 8, 10–11, 436 A.2d 125, 126–27 (1981) (plurality opinion) *with id.,* 496 Pa. at 13–4, 436 A.2d at 129 (concurring opinion).

injunction issued is reasonably suited to abate such activity. And unless the plaintiff's right is clear and the wrong is manifest, a preliminary injunction will not generally be awarded: *Keystone Guild, Inc. v. Pappas*, 399 Pa. 46, 159 A.2d 681 (1960), and *Herman v. Dixon*, 393 Pa. 33, 141 A.2d 576 (1958)."

*John G. Bryant Co., Inc. v. Sling Testing & Repair, Inc.*, 471 Pa. 1, 7, 369 A.2d 1164, 1167 (1977), *quoting Albee Homes, Inc. v. Caddie Homes, Inc.*, 417 Pa. 177, 181, 207 A.2d 768, 770 (1965); *accord, e.g., Commonwealth v. Coward*, 489 Pa. 327, 340–41, 414 A.2d 91, 98 (1980).

Judge Rufe's opinion recasts these requirements in what he considers their order of importance [7] as follows:

1. The plaintiff's right is clear and the wrong is manifest, and the injunction is reasonably suited to abate the wrong;

2. The injunction is necessary to prevent immediate and irreparable harm which could not be compensated by damages;

3. That greater injury would result by refusing it than by granting it;

4. That the injunction properly restores the parties to their status as it existed immediately prior to the alleged wrongful conduct.

The briefs for both United and the Inquirer contend that Judge Rufe erred in each of these four determinations, which we shall discuss in the same order as Judge Rufe.

---

7. Although Judge Rufe placed the "clear right" requirement first, one case on which he relies states, "The two most important factors to be taken into account are first, whether an immediate and irreparable harm is actually threatened and second, whether greater harm is caused by issuing the injunction than by refusing it." *New Castle Orthopedic Associates v. Burns*, 481 Pa. 460, 465, 392 A.2d 1383, 1385 (1978) (plurality opinion). Indeed, some recent cases confusingly suggest that when the "status quo" requirement (which Judge Rufe ranks last) is met, there is no need to show a "clear right" at all. *See* note 8, *infra*. In any event, we do not consider the order of importance significant in this case, and we have adopted Judge Rufe's order of importance merely for convenience of discussion.

We think there is no question that the plaintiff newspapers met the "clear right"[8] requirement.    Judge Rufe's

8.  United and the Inquirer argue that cases such as *McMullan v. Wohlgemuth,* 444 Pa. 563, 281 A.2d 836 (1971) require plaintiffs to make an even stronger showing than a "clear right," because the injunction granted here was mandatory.  *See, e.g., Jostan Aluminum Products Co., Inc. v. Mount Carmel District Industrial Fund,* 256 Pa.Super.Ct. 353, 359, 389 A.2d 1160, 1163 (1978) (plurality opinion) (order granting mandatory preliminary injunction vacated because "rights of the parties are less than entirely clear").  The principal case on which United and the Inquirer rely, *McMullan v. Wohlgemuth, supra,* is confusing for a number of reasons.  Although it approvingly quotes a statement that a mandatory preliminary injunction is granted only when the rights of the parties are "entirely clear," the *McMullan* opinion had said earlier in the same paragraph that a plaintiff could obtain a mandatory preliminary injunction if his rights were simply "clear."  444 Pa. at 573, 281 A.2d at 841.  In the immediately preceding paragraph, however, the merely "clear" right (as distinct from an "entirely clear" one) was said to be a requirement for a preliminary injunction of any kind, not just a mandatory one.  444 Pa. at 572, 281 A.2d at 840.  Even if these formulas could be reconciled, it is questionable whether they were supported by a majority of the Court, since three justices concurred in the result and Chief Justice Bell's "concurring and supplemental opinion," although it started by saying that he concurred in the opinion of the Court, stated only reasons strongly supporting the opposite result.  444 Pa. at 574, 281 A.2d at 841–42.

Another confusing aspect of *McMullan* is that it equates a mandatory preliminary injunction with one which changes the status quo.  444 Pa. at 573, 281 A.2d at 841.  On this point, it is plainly contradicted by *Roberts v. Board of Directors of School District of City of Scranton,* 462 Pa. 464, 469 & n. 1, 341 A.2d 475, 478 & n.1 (1975).  *Cf.* Leubsdorf, The Standard for Preliminary Injunctions, 91 Harv.L. Rev. 525, 535 (1978).  Other opinions agree with *McMullan* in equating a mandatory injunction with one which changes the status quo, although the same opinions also purport to follow *Roberts,* which says exactly the opposite.  *Mazzie v. Commonwealth,* 495 Pa. 128, 133, 432 A.2d 985, 988 (1981); *Shanaman v. Yellow Cab Company of Philadelphia,* 491 Pa. 516, 519, 421 A.2d 664, 666 (1980); *Commonwealth v. Coward,* 489 Pa. 327, 342, 414 A.2d 91, 99 (1980).

Further confusion arises from two recent opinions which appear to eliminate the "clear right" requirement, provided that the preliminary injunction does not change the status quo.  *Fischer v. Department of Public Welfare,* 497 Pa. 267, 271, 439 A.2d 1172, 1174 (1982); *Valley Forge Historical Society v. Washington Memorial Chapel,* 493 Pa. 491, 502, 426 A.2d 1123, 1129 (1981).  Whether such a rule could apply to mandatory preliminary injunctions would seem to depend on whether a court followed the *Roberts* case, which held that a mandatory injunction could preserve the status quo, or the *Mazzie, Shanaman* and *Coward* cases, which purported to follow *Roberts* while contradicting it on this point.  *Cf. Jostan Aluminum Products*

findings 4 through 13 and 18 through 20 overwhelmingly establish the formation of oral contracts between United and the plaintiffs on January 27, 1982.

■ To be enforcible, a contract must represent a meeting of the parties' minds on the essential elements of their agreement. *Yellow Run Coal Company v. Alma-Elly-YV Mines, Ltd.*, 285 Pa.Super.Ct. 84, 88, 426 A.2d 1152, 1154 (1981). This happened here on January 27, when Mr. Carroll and plaintiffs' representatives agreed on service ("Peanuts"), rate ($17.50 per week), and duration of the contract (one year). As demonstrated in Judge Rufe's finding 9, United itself recognized that agreement on these terms was sufficient to form a contract, because its uniform practice was to begin immediate performance at that point.

■ United and the Inquirer characterize the oral agreement of January 27 as mere "preliminary negotiations," because they did not include discussions of the terms in paragraphs 4 through 8 of United's written contract forms, described in Judge Rufe's finding 10. However, so long as the parties agree on essential terms which they intend to be binding, a contract is formed even though they intend to adopt a formal document with additional terms at a later

*Co., Inc. v. Mount Carmel District Industrial Fund, supra* (citing both *Roberts* and *McMullan*, which contradict each other).

What all this suggests is that Justice Pomeroy was correct in proposing that the Court explicitly abandon the illusory distinctions involving whether a preliminary injunction is mandatory and whether it preserves the status quo, and simply recognize that "courts should and do look at the underlying factual and legal controversies to determine both (1) the degree of irreparable harm that may befall either side if equitable relief is granted or withheld, and (2) the probability of success for the plaintiff after a full hearing." *Township of South Fayette v. Commonwealth*, 477 Pa. 574, 587, 385 A.2d 344, 351 (1978) (concurring opinion of Pomeroy, J., joined by Manderino, J.) (footnote omitted). In a future case we might determine that our Supreme Court's recent opinions, when we look past their anachronistic and inconsistent formulas to see what the Court actually did in the cases, do establish Justice Pomeroy's proposal as the standard for preliminary injunctions. *See* Leubsdorf, *supra*, 91 Harv. L.Rev. at 565. It is unnecessary to do so here, however, since plaintiff's showing was so overwhelming as to meet the most stringent standard possible. *See* note 11, infra and accompanying text.

date. *Field v. Golden Triangle Broadcasting, Inc.*, 451 Pa. 410, 418, 305 A.2d 689, 693 (1973); *Goldman v. McShain*, 432 Pa. 61, 69, 247 A.2d 455, 459 (1968);[9] Restatement of Contracts, 2d, § 27. The contention of United and the Inquirer that a contract cannot exist until the signed forms are accepted by United at its home office[10] is belied not only by the overwhelming evidence of the uniform practice as described in Judge Rufe's finding 9, but also by the fact that the Inquirer itself was running "Peanuts" by oral agreement with United before the written contract purporting to give the Inquirer exclusive rights was signed on February 8, 1982.[11]

**9.** The Inquirer claims that the reliance by plaintiffs on the *Field* and *Goldman* cases is misplaced, because those cases both involved informal writings, which were claimed to be contracts despite the fact that a more formal document was contemplated later. The Inquirer would distinguish this situation from the case before us, which involves a claim that the earlier contract was formed orally. This reasoning is plainly specious, since plaintiffs do not rely on *Field* and *Goldman* for the specific manner in which the earlier contracts were formed. Nothing in either opinion indicates that the holding is restricted to a specific manner in which the alleged earlier contract was formed. What is controlling is whether or not agreement was reached on all essential terms and the parties intended to be bound. This was overwhelmingly established here. *See* note 11, *infra*, and accompanying text.

**10.** United and the Inquirer point out that the written forms themselves provide in paragraph 8: "This Agreement shall not be effective until accepted by UFS at New York, New York, and shall bind each party's successors and assigns." This provision does not preclude a prior oral agreement, as succinctly demonstrated by the Supreme Court of Iowa:

Defendants are right that no action is maintainable by [plaintiff] *on the order form itself* because of that clause. But that clause does not legally prohibit a parol contract; if it did, defendants would be able to give contractual force to a clause in an order form which they themselves argue is not a contract.

*Meylor v. Brown*, 281 N.W.2d 632, 635 (Iowa 1979) (emphasis in original).

**11.** Plaintiffs' Exhibit P–29 is the top of Page 1- A of the Inquirer for Saturday, February 6, 1982. At the very top, above the newspaper's name appear the words, "Inside: Peanuts, Blondie and B.C.," underlined and in approximately 27-point type. *See* 45 Pa.C.S. § 101 (1980 Pamphlet at 7).

Plaintiff's Exhibit P–30 is the top of the Inquirer's page 1–A for Sunday, February 7, 1982. In the same position and type size appear

It is also clear that the three plaintiff newspapers would suffer irreparable injury by being deprived of an extremely popular feature, hampering their effort to compete with the Inquirer for former Bulletin subscribers. The lengthy arguments of United and the Inquirer on this issue can be broken down into two parts: (1) there was no adequate showing that the plaintiff newspapers would have any losses from being deprived of "Peanuts," and (2) assuming losses should occur, they will be compensable in readily ascertainable damages. The testimony of Mr. Oppenheimer, which Judge Rufe found credible and summarized in finding 14, plainly demonstrated the superior value of "Peanuts" in the competition for former Bulletin subscribers. It is difficult to understand the Inquirer's contention that this testimony was inadequate because Mr. Oppenheimer conceded that the plaintiff newspapers would not cease to exist if deprived of "Peanuts." Plaintiffs are required to show irreparable harm, not annihilation.

Moreover, just as appellants' claim that there is never an oral contract in the newspaper features industry was contradicted by the Inquirer's own printing of "Peanuts" under an oral contract, the claim that "Peanuts" is not a uniquely valuable property in competing for former Bulletin subscribers is contradicted by the fact that the Inquirer placed "Peanuts" in its list of special features above the masthead

the words, "Bulletin comics inside: Peanuts, Family Circus and more." Plaintiffs' Exhibit P–26 is a copy of the written agreement signed by the Inquirer and United on February 8, 1982. The commencement date for service on "Peanuts" is February 1, 1982. In addition to this undisputed evidence that the Inquirer ran "Peanuts" pursuant to an oral contract, the undisputed testimony of Mr. Oppenheimer was that plaintiffs were running "Jack Anderson," another United Feature, at the time of the hearing without a written contract. Furthermore, United's own attorney brought out on cross-examination that another newspaper (the Quakertown Free Press) was running features during this period pursuant to an oral contract with United. Indeed, as Judge Rufe's finding 9 points out, the Free Press's managing editor testified that no written contract had yet been signed for three of the four United features the Free Press was running at that time. In view of all this, it is surprising that United and the Inquirer have contested this issue at all.

for four consecutive days during the period shortly after the Bulletin's demise. All features listed for those days are comic strips. "Peanuts" is the only one listed on all days, and it is listed first every day.[12]

Thus the Inquirer itself viewed "Peanuts" as the most valuable of the newly added features in attracting readership during this period. While "Peanuts" was demonstrably the most valuable, however, the other features have value too. Since all newspapers involved here are adding a number of features at the same time, it will be impossible to attribute particular increases in circulation to any one feature. This is especially true because, as appellants themselves assert, the drawing power of "Peanuts" does not stand on its own, but only in combination with other features.[13]

Greater injury will result from denying the preliminary injunction than from granting it. United can have no

12. Plaintiffs' Exhibits P–29 and P–30 were described in note 11, *supra*. In addition, Exhibits P–31 and P–32 show similar listings above the Inquirer's name for Monday, February 8, 1982 ("Comics inside: Peanuts, Family Circus, Beetle and more") and Tuesday, February 9, 1982 ("Inside: Peanuts, B.C. Andy Capp and Blondie"), respectively. The premiere position assigned to "Peanuts" by the Inquirer in its efforts to attract former Bulletin readers clearly demonstrates its unique and superior value. *Compare Philadelphia Ball Club, Ltd. v. Lajoie*, 202 Pa. 210, 51 A. 973 (1902) (baseball player with demonstrably superior talent) with *A.L.K. Corporation v. Columbia Pictures, Inc.*, 440 F.2d 761 (3rd Cir. 1971) (film "Husbands," while "unique" in sense that every film is unique, not shown to be superior to general run of films). The Inquirer argues that the last sentence of Judge Rufe's finding 14 (" 'Peanuts' is regarded as the most popular feature of all.") is not supported by a comparison with features other than comic strips. In view of the fact that the Inquirer used only comic strips above its name on Page 1–A (with "Peanuts" always in the lead position) during this crucial period, this argument is at best a meaningless quibble.

13. *Compare Philadelphia Ball Club, Ltd. v. Lajoie, supra*, 202 Pa. at 217 n.12, 51 A. at 974 n.12 (superior ball player was "integral part of the team work which is so essential.") *with D.W.H. Corp. v. Twentieth Century Fox Film Corp.*, 182 F.Supp. 912, 913 (E.D.Pa.1960) (any damages to movie theater which was denied opportunity to exhibit film "Can-Can" could be computed once film completed run at other theater).

irreparable injury,[14] and so it is only the Inquirer's potential for injury which must be weighed against that of the plaintiffs. As Judge Rufe's opinion points out, denial of the injunction would completely deprive the plaintiff newspapers of "Peanuts," while the Inquirer will still be able to publish it whether the injunction is granted or denied. The grant of the injunction will deprive the Inquirer only of the exclusive character of its publication, and even this effect will be limited to a small part of its circulation area.

Finally, Judge Rufe's order restored the "status quo" [15] which existed when the alleged wrong occurred. The wrong here occurred on January 29, 1982, when United repudiated the oral contracts and refused to perform further. The preliminary injunction restored the conditions existing just before United's repudiation. Judge Rufe thus had reasonable grounds for finding all requirements for a mandatory preliminary injunction were met.

Order affirmed.

14. United does claim in its brief that it will suffer irreparable harm, but the argument it offers does not relate to irreparable harm. Instead, it is essentially a rehash of another section of United's brief, in which United claims that Judge Rufe in effect awarded permanent relief at the preliminary hearing. This section of the brief is itself principally devoted to restating United's argument concerning the degree of probability of eventual success on the merits which plaintiffs must show for a mandatory preliminary injunction. We have already held that any possible requirement for a mandatory preliminary injunction has been met. *See* note 8, *supra.* As for United's unsupported claim that Judge Rufe awarded final relief, this is plainly not so, since Judge Rufe's order explicitly provides that it is only effective pending the outcome of the request for a permanent injunction. We also note that the idea that a court cannot use a preliminary injunction to give all relief available at a final hearing has been severely criticized as a confusing bromide, Leubsdorf, *supra,* note 8, 91 Harv.L.Rev. at 545–46 & n. 108, but we need not determine here whether the "rule" retains any validity, because Judge Rufe did not award final relief. *Cf.* note 8, *supra.*

15. *See* note 8, *supra.*