**METROMEDIA BROADCASTING CORPORATION, Plaintiff,**

v.

**MGM/UA ENTERTAINMENT CO., INC., et al., Defendants.**

**No. CV 85–1494–PAR(Bx).**

United States District Court, C.D. California.

April 1, 1985.

Peter Sullivan, Gibson, Dunn & Crutcher, Los Angeles, Cal., for plaintiff.

Alan D. Croll, Wyman, Bautzer, Rothman, Kuchel & Silbert, Los Angeles, Cal., for defendants.

## MEMORANDUM OF DECISION AND ORDER

RYMER, District Judge.

Plaintiff Metromedia Broadcasting Corporation (Metromedia) alleges that defendants MGM/UA Entertainment Co., Inc., United Artists Corporation, Inc., and MGM/UA Television Distribution (MGM/UA) have refused to negotiate exclusively and in good faith with plaintiff with respect to the broadcast rights to newly produced first-run episodes of FAME, in violation of their current license agreement; and have conditioned the license of those rights on plaintiff's accepting syndicated reruns of FAME, which plaintiff does not want, in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 and section 3 of the Clayton Act, 15 U.S.C. § 14. Metromedia seeks a preliminary injunction, enjoining MGM/UA from negotiating, entering into or performing agreements with plaintiff's competitors to license new FAME episodes and from engaging in a tying arrangement.

■ The Clayton Act provides injunctive relief under the same principles as generally applied by courts of equity. 15 U.S.C. § 26; *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 634 F.2d 1197, 1200 (9th Cir.1980). Traditionally these include "(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if the prelimi-

nary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases)." *Los Angeles Memorial Coliseum*, 634 F.2d at 1200. In the Ninth Circuit the moving party must show a combination of either (1) probable success on the merits and irreparable injury, or (2) the raising of serious questions and tipping of the balance of hardships sharply in its favor. *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984). These are not separate tests, but extremes of a single continuum. *Benda v. Grand Lodge of the Int'l Ass'n of Machinists*, 584 F.2d 308, 315 (9th Cir.1978), *cert. dismissed*, 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979).

■ It is also clear that, "[r]egardless of how the test for a preliminary injunction is phrased, the moving party must demonstrate irreparable harm. *Flynt Distributing Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir.1984) (quoting *Los Angeles Memorial Coliseum*, 634 F.2d at 1202). Reasonable apprehension of threatened injury will suffice. 15 U.S.C. § 26; *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969)." *American Passage Media Corp. v. Cass Communications*, 750 F.2d 1470, No. 84–3688 (9th Cir.1985).

Applying these criteria leads me to conclude that, despite the manifest excellence of plaintiff's papers and argument, the requisite showing for the kind of extraordinary relief requested—in the nature of mandatory specific performance—cannot be made. I shall therefore deny the preliminary injunction on the basis of the following findings of fact[1] and conclusions of law.

### A. *The contract claim.*

MGM/UA first produced a feature-length motion picture entitled FAME and thereafter a television series that ran on the NBC television network for two programming years (1981–82 and 1982–83).

---

1. The Court's detailed findings of fact are filed separately, under seal.

When it was cancelled by NBC in the spring of 1983, MGM/UA approached Metromedia regarding the possibility of syndicating FAME on a first-run basis. An agreement was reached according to which 22 to 26 new episodes would be produced, to be repeated once during the year, with the difference between the number actually produced and 26 to be made up by "additional telecasts" consisting of shows produced during the preceding year (and already run on NBC); and to be broadcast on a "barter network" basis with Metromedia stations' having an exclusive license in their area. FAME was to be identified as a "Metromedia network presentation." The agreement was renewed for a second season and reduced to writing in May, 1984. As part of those negotiations Metromedia requested a *right of first refusal* on "new programs in the series and/or additional runs of the programs licensed hereunder;" MGM/UA rejected that proposal but accepted in principle a counter-proposal for approaching Metromedia first "before trying to sell the programs to another station in one of our markets." That substantially became the *"right of first negotiation"* set forth in clause (g) of the agreement, providing that MGM/UA shall negotiate in good faith exclusively with Metromedia before discussing with any third party the granting of "any television exhibition rights to any additional episodes of the Series in the Territory licensed hereunder." It also appears to be customary in the industry for a producer to return to the original licensee and offer reasonable terms for continued use of the same program or for any type of product associated with the underlying program.

With the approach of the end of the fourth season of production, syndication of reruns became feasible because the number of episodes "in the can" was sufficient to support a nightly play ("strip" syndication). Accordingly in October, 1984 MGM/UA offered Metromedia 136 episodes of FAME (of which 88 had already been produced and would have been aired). Metromedia objected to the packaging and pricing of reruns with first runs, but even-

tually (late January/early February) made an offer for both. In the meantime it released its stations to negotiate individually with MGM/UA; and MGM/UA also approached the Tribune Broadcasting Company with an offer for both first runs and reruns. Metromedia's counteroffer was not accepted and on February 21, 1985 MGM/UA concluded a deal with Tribune Company on terms and conditions which were comparable to its last offer to Metromedia. Tribune has stations which compete with Metromedia's in two markets, New York and Chicago. This suit was filed March 5, 1985.

Metromedia claims that, contrary to its contractual obligation [clause (q)] and to custom and practice in the industry, MGM/UA failed to negotiate in good faith for rights to the 1985–86 FAME season; such a right is enforceable because both the contract and course of dealing between the parties gives definition to the right; and MGM/UA breached the contract by conditioning future first runs on plaintiff's also taking reruns and refusing to negotiate separately as to each. MGM/UA asserts that what Metromedia in effect seeks is a right of first refusal, which was specifically requested but rejected; that a right of first negotiation is illusory and unenforceable; and that MGM/UA performed because under its interpretation of the contract, it was obligated to make an offer first to Metromedia for all additional episodes, *i.e.*, new first runs and reruns as they became available.

■ Both parties appear to agree, at least for purposes of this motion, that New York law applies. The weight of New York authority holds unenforceable a clause (q)-type agreement to negotiate in good faith. *Candid Productions, Inc. v. International Skating Union*, 530 F.Supp. 1330 (S.D.N.Y.1982); *Jillcy Film Enterprises, Inc. v. Home Box Office, Inc.*, 593 F.Supp. 515 (S.D.N.Y.1984) (agreement to "negotiate exclusively in good faith with respect to the terms and provisions relating to the distribution, exhibition or other exploitation" of a documentary not enforce-

able because the agreement provided no definite, objective criteria or standards against which HBO's conduct can be measured); *see Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257 (2d Cir.1984) (implied duty to negotiate in good faith too indefinite to be enforced under New York law); *Mocca Lounge, Inc. v. Misak*, 94 A.D.2d 761, 462 N.Y.S.2d 704 (2d Dep't 1983) (definite and certain duty to negotiate in good faith is enforceable if there are clear set of guidelines against which to measure the party's efforts). In *Candid Productions,* the parties had a sixteen-year contractual relationship for the television rights to events sponsored by the .ISU. Prior contracts contained a right of first refusal clause that required ISU to engage in a period of negotiations with Candid for rights to the next set of championships and granted Candid a right to match any competing offer by a third party if agreement were not reached during the initial negotiation period. The clauses were substantially similar in concept and detail to the right of first refusal proposed by Metromedia, but rejected by MGM/UA. Like the course of events in this case, in *Candid Productions* the right of first refusal came to be rejected and a provision that ISU would "not negotiate any further contracts for the rights for the World Championships after 1982 without first negotiating in good faith with Candid" was substituted. Also like the course of events in this case, in *Candid Productions* the ISU informed Candid that instead of contracting for a single event for a period of years, as they had in the past, it wanted to structure the contract to cover all six ISU championships for a five-year period—a package deal. The ISU ultimately negotiated that kind of deal with CBS. The court granted summary judgment for ISU on the ground that the good faith negotiation clause was so vague and indefinite as to be unenforceable.

**2.** As put by Judge Weinfeld:
"An agreement to negotiate in good faith is amorphous and nebulous, since it implicates so many factors that are themselves indefinite and uncertain that the intent of the parties

Metromedia attempts to circumvent *Candid Productions* by giving content to its right from two sources: first, the course of dealings between the parties as reflected by their 1983–84 and 1984–85 experience, and the first run part of the 1985–87 proposal; and second, custom and practice in the industry, to come back to the same entity for new episodes and not to condition future use on acquisition of further products. However in light of substantial evidence of Metromedia's concern for protection on *both* first runs and reruns—and MGM/UA's belief that it was obliged to offer Metromedia the right to reruns, I cannot find that the contract right to negotiate with respect to "additional episodes" pertains only to first runs. Absent such a limitation, there is substantial doubt that Metromedia can show bad faith and thus entitlement to first runs apart from reruns. Nor is it clear that there *is* a custom and practice with respect to television rights to syndicated first runs and reruns of syndicated first runs; first run syndication of dramatic works appears to be a relatively new development in the industry, and is concededly "without rules."

These difficulties are further compounded by virtue of the unusual character of the injunction that is sought. It is not to maintain the status quo (either in time or terms), but is rather to reverse the results of four months' negotiation and to require MGM/UA to undo half of an offer (the whole of which could have been made to take account of the increased value of FAME now that syndicated reruns are possible)—and to give, not "negotiate," the right to future first runs on the same terms and conditions as FAME, less reruns, was offered to Tribune (and earlier to Metromedia). In effect that would appear to be an option, or right of first refusal. To that extent it is precisely what MGM/UA declined to agree to, and what the court in *Candid Productions* declined to order.[2] *Cf. Radio Webs, Inc. v. Tele-Me-*

can only be fathomed by conjecture and surmise. Suppose the defendant, in its initial request, asks for an amount for the licensing rights which plaintiff considers exorbitant or outrageous and in its view has been advanced

*dia Corp.*, 249 Ga. 598, 292 S.E.2d 712 (1982) (enjoining breach of right of first refusal). It would also appear to be inconsistent with the industry's conception of a right of first negotiation as an obligation simply to *talk* about a new program, not necessarily to accomplish it, limited in time to a day or two.

■ Moreover, neither custom and practice nor the obligation of good faith and fair dealing may supply a term which adds something new or different to the rights and obligations to which the parties have expressly agreed. *See Niagara Mohawk Power v. Graver Tank & Mfg.*, 470 F.Supp. 1308, 1321 (N.D.N.Y.1979); *see also Jillcy.* There is nothing in the agreement between the parties which provides that first runs are to be negotiated separately from reruns; indeed reruns and first runs were negotiated together for each of the prior seasons on Metromedia, in that some reruns were explicitly contemplated as comprising part of the total programming package as it was originally licensed.

■ Finally, I am concerned that in the absence of objective criteria such as are normally found in a right of first refusal, it would be impossible and unfair to determine whether any particular conduct by MGM/UA would constitute contempt. Would it be contempt for MGM/UA to cra-ter FAME and make no offer? or to raise the price or change the compensation for first runs from barter to cash, or a different balance of barter, or a combination of barter and cash? or to decline an exclusivity provision?

### B. *Antitrust and misuse claims.*

Each episode of FAME is copyrighted; FAME is (by definition) unique; and there appear to be few network-quality syndicated first run dramatic works on the market (examples would be "Too Close for Comfort" and "Paper Chase"), although numerous syndicated first run programs of other sorts are available (such as sporting events and game shows). MGM/UA linked the future licensing of first runs with reruns [3] in its offer to Metromedia, Tribune, and WTOG–TV. Metromedia owns and operates seven television stations (Los Angeles, New York, Chicago, Boston, Washington, Houston and Dallas) which reach 24% of the domestic television market; Tribune has five stations (New York, Chicago, Atlanta, Denver and New Orleans) reaching approximately 14% of the country; and WTOG–TV is in St. Petersburg, Florida.

Metromedia argues that first run episodes are a separate product from strip syndicated reruns, because each attracts a different level of advertising revenue and viewership, and is traditionally purchased

solely for the purpose of defeating the Court's direction to negotiate. On what basis does the Court decide that the sum is so unreasonable so that it can determine that the propose was contrary to good faith bargaining? Is the Court then required in furtherance of its decree to direct the parties to continue negotiations until they reach an agreement or does it conclude that an impasse has resulted which reflects good faith and thereby releases the defendant to negotiate with third parties? Indeed, this is by no means a hypothetical inquiry. There is no dispute that when Candid was aware that CBS was in the picture, the plaintiff jumped its original offer from a sum of $1.43 million for the total package of all the skating events to an ultimate figure of $5 million or 10% or $100,000 above any offer made by CBS, whichever was higher.

... Moreover the suggestion by Candid that the decree contain a provision that the parties 'continue the negotiations for a sufficient minimum period before signing with another to permit a fair opportunity to overcome in all respects the comparative attractiveness of competitive proposals' is hardly a thinly disguised method of reinstating the first refusal right which had been eliminated from the current contracts. This would be contrary to the parties' deliberate elimination of that provision from the contracts at issue." *Candid Productions*, 530 F.Supp. at 1337.

3. MGM/UA's version of how it has marketed future rights to FAME has varied, from its position at the hearing on plaintiff's request for a TRO (no package); to a "preference" that Metromedia take both reruns and first runs; to use of the first runs as a "carrot"; to offering FAME in its entirety; to "no guarantee" of first runs without reruns. Regardless of how these different characterizations affect the credibility of defendants' position, the common denominator is that all the rights, to reruns as well as first runs, were apparently linked or packaged.

separately, *Jefferson Parish Hospital District No. 2. v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2; *American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatres, Inc.,* 221 F.Supp. 848 (S.D.N.Y.1963); *American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatres, Inc.,* 388 F.2d 272 (2d Cir.1967); MGM/UA has sufficient market power in the tying product [FAME first runs] on account of its holding copyrights on FAME, and defendants' conduct is virtually identical to the block-booking found *per se* illegal in *United States v. Loew's, Inc.,* 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962); conditioning the purchase of first runs on reruns reflects an attempt by MGM/UA to gain a competitive advantage in the market for reruns; Tribune was coerced into licensing the package, *see Osborn v. Sinclair Refining Co.,* 286 F.2d 832 (4th Cir.1960), *cert. denied,* 366 U.S. 963, 81 S.Ct. 1924, 6 L.Ed.2d 1255 (1961); *Moore v. Jas. H. Matthews & Co.,* 550 F.2d 1207 (9th Cir.1977); injury to competition is presumed, *Digidyne Corporation v. Data General Corporation,* 734 F.2d 1336 (9th Cir.1984), *cert. granted,* — U.S. — (1985); it has standing as a consumer, *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982); *Warner Management Consultants, Inc. v. Data General Corp.,* 545 F.Supp. 956 (N.D. Ill.1982) to seek both damages and injunctive relief, *see Parks v. Watson,* 716 F.2d 646 (9th Cir.1982); and that in any event there has been a misuse of the copyright monopoly to obtain a competitive advantage in another market, *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980); *Columbia Broadcasting System v. American Society of Composers, Authors and Publishers,* 562 F.2d 130 (2d Cir.1977), *rev'd on other grounds,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979).

MGM/UA contends, on the other hand, that there is no unlawful tie-in because the bundle of rights subsumed under the FAME copyright are a single product which distinguishes the packaging of FAME first runs and FAME reruns from the block-booking condemned in *Loew's;* Tribune was not coerced because it wanted "all" of FAME; no relevant market has been monopolized because there is no such market as the "strip syndicated rerun" market and monopoly power can't exist simply because FAME (like all dramatic works) is unique; there has been no attempt to monopolize any relevant market because defendants' conduct does not clearly threaten competition nor is it clearly exclusionary; tie-ins are not necessarily anticompetitive, *Hyde,* and regardless, there is no demonstrable effect on competition in any real market; plaintiff lacks antitrust standing because it has not purchased either first runs or reruns and cannot be injured because, on its theory, its competitor paid too much for the rights, leaving it with nothing about which to complain except being a jilted customer; and that for the same reasons, there has been no misuse of copyright.

The issue posed is interesting and novel: whether to license as a package the component rights of which a copyright in a single intellectual property consists, amounts to a tying arrangement which runs afoul of the antitrust laws or constitutes an abuse of the copyright monopoly. I conclude that neither will so likely be proved that, when weighed with other appropriate considerations, preliminary relief should be granted.

### 1. *What was packaged.*

MGM/UA attempted to license a package of 136 copyrighted programs of FAME to Metromedia; and it did license the 136 to Tribune. Of these, 88 have been produced and televised over the last four years. The other 48 have yet to be produced or broadcast. Metromedia does not challenge MGM/UA's right to package the 48 forthcoming *first run* productions.[4] However it

---

**4.** Conceptually, to condition a license of one new episode on another new episode is the same

does contest MGM/UA's right to require the license of strip syndicated reruns, apparently those "in the can" as well as those to be created.

Unlike the block-booking in *Loew's* and *Paramount, Mulvey v. Samuel Goldwyn Productions,* 433 F.2d 1073 (9th Cir.1970) and *Aurora Enterprises v. National Broadcasting Co.,* 688 F.2d 689 (9th Cir. 1982), MGM/UA did not condition the license of, or use leverage from, one copyrighted property (like "Star Wars") to license another, unrelated (and unwanted) property (like "Planet of the Apes"). It did offer two rights, the right to telecast first runs (which Metromedia wants) with the right to telecast reruns (which Metromedia does not want but the Tribune took). However, both these rights inher in the copyright. 17 U.S.C. § 106. Therefore a substantial question exists about plaintiff's ability to show that the scope of the monopoly is enlarged by the granting of one license only, *cf. Paramount; Mercoid Corp. v. Mid-Continent Inv. Co.,* 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376 (1944), or that competition is suppressed beyond that which is permitted by the copyright laws. *See Cardinal Films v. Republic Pictures Corp.,* 148 F.Supp. 156 (S.D.N.Y.1957) (Judge Edelstein holding that neither can be where defendant conditioned license to distribute copyrighted motion picture on purchase of 16mm prints from it); *Waldbaum v. Worldvision Enterprises, Inc.,* 1978 Trade Cas. ¶ 62,378 (S.D.N.Y.1978).[5]

■■■ In its recent decision in *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), the Supreme Court defined the test for separate products to be whether the arrangement "link[s] two distinct markets for products ... distinguishable in the eyes of buyers." 104 S.Ct. 1562. This, in turn, depends not on the functional relation between the two items, but on the character of the demand for them. *Id.* at 1562. The test is intended to prohibit only those arrangements which create the possibility of "foreclos[ing] competition on the merits in a product market distinct from the market for the tying item." *Id.* at 1563.

In *Hyde* the Court found that two distinguishable services were provided in a single transaction in part because anesthesiological services could efficiently be offered separately from hospital services and were billed separately, so that consumers differentiated between anesthesiological services and the other hospital services provided by the defendant. In this case, plaintiff is likely to show that syndicated reruns generally are offered separately from first runs; but neither side has adduced evidence of how syndicated reruns are marketed vis-a-vis *syndicated* first runs. That there may be a difference is suggested by the original programming package in this case, which included first runs, and reruns. There is no track record with respect to whether FAME reruns and first runs could be separately *sold;* however there is evidence that they could not be simultaneously *shown* without confusing the viewer and diluting the value of both. Although first

as to condition a license of one new episode on one old one. However the former obviously comports with industry practice and the buyers' preference. Also, unlike the comparison between first runs and reruns, there is no suggestion of a separate market. At the same time, it is unclear where along the continuum between one new episode conditioned on another new episode, to lots of new episodes conditioned on lots of old episodes, conduct concededly lawful becomes unlawful—when in any case it is the same intellectual property which is subject to license. *See Waldbaum v. Worldvision Enterprises, Inc.,* 1978–2 Trade Cas. ¶ 62,378 (S.D.N.Y. 1978); *Cardinal Films v. Republic Pictures Corp.,* 148 F.Supp. 156 (S.D.N.Y.1957).

**5.** This would appear to be particularly true in the case of the reruns which are not already in the can. Increasing the number of uses of each copyrighted work from two (first run [original plus repeat within same week] plus one rerun) to several (first run plus additional reruns), and changing the form of payment from barter to barter plus cash, appears clearly to be within the scope of MGM/UA's legitimate exploitation of its copyrights. Packaging of the episodes to be created in the future, including however many reruns thereof MGM/UA thinks appropriate, would therefore not appear in any event to constitute a tying arrangement. *See Waldbaum; Cardinal Films.*

runs and reruns generally appear to be independently priced,[6] and first run rights to FAME are essentially barter while reruns are essentially cash, those FAME reruns that were part of the original programming package were priced together with first run episodes on a barter basis. Thus the normal distinction may be blurred in this case. Finally, although not directly relevant since the competition impacted is among producers trying to syndicate reruns or television stations that are rerun consumers, the public would appear to perceive reruns differently from first runs in that ratings (and in turn advertising revenues) are less for reruns than for their corresponding first runs. To this extent demand for reruns may be separate from that for first runs. *Cf. Times-Picayne Publishing Co. v. United States,* 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). However there is nothing in the record to suggest that some reruns are not perceived more favorably than first runs (or other reruns) against which they may be competing in any given time slot or any given market.

Plaintiff faces a further difficulty because of how it posits power in the tying market. For that purpose, Metromedia defines the tying product as FAME's copyright and uniqueness. Inotherwords, all of FAME that inheres in the copyright is the product from which market power derives. However, the "tied" product has the same copyright and uniqueness. Accordingly the copyright and/or uniqueness that constitutes the tying product is not distinguished from the product to which it is tied.

On balance, while a serious question may be raised about whether the demand for first runs is separate from that for reruns under *Hyde,* that may not be material when the licensing of a single intellectual property is at issue. *Cardinal Films; Waldbaum.* In such a case competition on the merits of unrelated properties, whether in strip syndication or first run, is unlikely to be implicated for any reason other than quality. Thus, to carve up the FAME copyright would not appear to serve the competitive purposes of the rule against tying.

### 2. *Market power.*

 The tie of one product to another is *per se* illegal only if the seller possesses sufficient market power in the tying product [FAME first runs] appreciably to restrain trade in the tied product [FAME reruns].[7] Forcing must be probable. *Hyde,* 104 S.Ct. at 1560. Assuming a threshold showing of a substantial potential for impact on competition (as, for example, when a tie affects more than a single purchaser or a substantial volume of commerce is foreclosed), *Hyde* reaffirms the proposition that a seller, in this case MGM/UA, may be presumed to have power in the tying product [FAME first runs] when it holds a copyright or has an otherwise unique item. *But see Hyde,* —— U.S. at ___, 104 S.Ct. at 1568, 80 L.Ed.2d at 25 (O'Connor, J., concurring opinion). In so doing the Court relied on the rationale of *Loew's,* as follows: "Any effort to *enlarge the scope* of the patent monopoly by using the market power it confers to restrain competition in the market for a *second* product will undermine competition on the merits in that second market. Thus, the sale or lease of a patented item on condition that the buyer make all his purchases of a separate tied product from the patentee is unlawful. *See United States v. Paramount Pictures,* 334 U.S. 131, 156–159, 92 L.Ed. 1260, 68 S.Ct. 915 [928–930] (1948); *International Salt [v. U.S. ],* 332 U.S. [392], at 395–396, 92 L.Ed. 20, 68 S.Ct. 12 [at 14–15]; *International Business Ma-*

---

**6.** It would also appear to be the case that a rerun is an integral part of the copyrighted first run. *See Casey v. Diet Center, Inc.,* 590 F.Supp. 1561 (N.D.Cal.1984); *cf. Data General,* 734 F.2d at 1343. A rerun is identical to its corresponding first run, and necessarily could not exist but for the original; likewise, the value of a rerun is related to, and stems from, the success of the original.

**7.** MGM/UA suggests that the tying product may instead be the rerun rights. However there is no substantial support for such a view.

chines Corp. v. United States, 298 U.S. 131, 80 L.Ed. 1085, 56 S.Ct. 701 (1936)." Id. at 1560–61. In each of these cases per se illegality was premised on misuse of the copyright or patent or unique commodity to foreclose competition on an item bearing an unrelated copyright or patent or attribute. See also Digidyne Corp. v. Data General Corp., 734 F.2d 1336 (9th Cir.1984), cert. granted, —— U.S. —— (copyrighted operating system software used to sell CPUs). Because the scope of the defendants' monopoly has not been enlarged so as to impact sales of anything other than a right included within the copyright on FAME, I doubt the applicability of the per se rule.[8]

 Neither side makes any particularly extensive analysis of the markets in which first runs and/or reruns are sold, Hyde. 104 S.Ct. at 1561. There is insufficient evidence in the record from which to conclude whether the relevant market would be all television shows, or all first runs, or all syndications, or syndicated first runs, or some combination of these—or nationwide, or territory by territory, or independent network by independent network; or whether the relevant competitors would be all producers of first run episodes, or only of syndicated first run episodes, or only of first run episodes which have been (prematurely) cancelled for network play. Nor is there any substantial indication of what MGM/UA's share of any of these markets would be. The contract at issue has an affect on six Tribune stations plus one independent in St. Petersburg; or seven Metromedia stations. Thus, I cannot say that plaintiff is likely to show that defendants' share of any relevant market is more than the shares held insufficient in Hyde and Times-Picayune.

There likewise is no way to determine whether there are close substitutes in any meaningful market. Plaintiff raises a potentially serious question with respect to power in the market for syndicated first runs, since there evidently are but a handful of dramatic works now in production. However I cannot conclude that there is any reasonable likelihood of such a restricted market's being defined. Finally, there is nothing to suggest that television stations are not price conscious or are without ample information about the quality of competing properties.

### 3. Restraint or affect on rerun market.

Plaintiff raises an issue (based on hearsay evidence), which may be serious, about a glut on the rerun market in general that may give MGM/UA the ability to foreclose competition in the syndication market because of leverage which comes from its relatively unique position as producer of syndicated first runs. However there is no evidence that quality or supply, or television station choice or demand, is affected, or likely to be affected, by the tying arrangement at issue (except inferentially to the extent that money otherwise being paid for FAME would be spent on different reruns—for which there is no support in the record). Since MGM/UA could exert the market power directly in the tying product which it legitimately has through ownership of the FAME property by affixing any price it wishes to the first run license, it may be irrelevant that it does so indirectly by "forcing" a station to buy the rerun rights. This may particularly be the case when to do so is the only means by which to reverse negative cash flow, recoup costs of production, and continue to create new episodes. See, e.g., Moore; cf. Data General.

### 4. Damages.

 In order for plaintiff to prevail on the merits it must also show injury causally related to defendants' antitrust violation. Kline v. Coldwell, Banker & Co., 508 F.2d 226 (9th Cir.1974), cert. denied, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975). Hyde recognizes that it is not un-

---

**8.** Unlike Data General, supra, there is no indication in this case that creation or production of comparable programs is economically infeasible, or that many television stations are "locked in" to the defendants' tying product [FAME first run episodes] by any investment in reruns.

lawful for one with market power simply to increase the price of the tying product so long as competition on the merits in the market for the tied product is not impaired in order to insulate an inferior product from competitive pressures. Simply to show that a noncompetitive price has been paid for the product which is tied is not enough. *See Siegel v. Chicken Delight, Inc.*, 448 F.2d 43, 52 (9th Cir.1971), *cert. denied*, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972); *Kypta v. McDonald's Corp.*, 671 F.2d 1282, 1285 (11th Cir.), *cert. denied*, 459 U.S. 857, 103 S.Ct. 127, 74 L.Ed.2d 109 (1982); *Casey*, 590 F.Supp. at 1571–2; *see also United States Steel Corp. v. Fortner Enters., Inc.*, 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977). Accordingly, "to demonstrate the injury necessary to establish defendant's liability, plaintiff must prove that the payment for both the tied and tying product exceeded their combined fair market value." *Casey*, 590 F.Supp. at 1571. There is no indication that this is the case.

5. *Standing.*

▪▪▪▪ Whether the plaintiff is a proper party to bring this action depends upon the nexus between the alleged wrongdoing by the defendants and harm to plaintiff, and upon the relationship of the injury alleged with those forms of injury about which the antitrust laws are concerned. *See Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149; *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). Under section 4 of the Clayton Act five factors are relevant: (1) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (2) the causal connection between the antitrust violation and harm to plaintiff; (3) the speculative measure of the damages; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages. *Bubar v. Ampco Foods, Inc.*, 752 F.2d 445, 449 (9th Cir.1985). Less stringent requirements exist for standing to assert an equitable ac-

tion brought under section 16 of the Clayton Act. Id. at 449 n. 2. Thus on this motion, the Court need only be concerned with the nature of plaintiff's alleged injury and its directness.

Although not free from doubt, Metromedia appears to have standing as a consumer in the market in which trade was restrained. *Associated General Contractors*, 459 U.S. at 539, 103 S.Ct. at 909; *McCready;* and *see Mulvey v. Samuel Goldwyn Productions*, 433 F.2d 1073, 1076 (9th Cir.1970); *Aurora Enters. v. National Broadcasting Co.*, 688 F.2d 689 (9th Cir. 1982); *Fields Productions, Inc. v. United Artists Corp.*, 432 F.2d 1010 (2d Cir.1970) (per curiam), *aff'g*, 318 F.Supp. 87 (S.D.N.Y.1969), *cert. denied*, 401 U.S. 949, 91 S.Ct. 932, 27 L.Ed.2d 232 (1971). Also it would appear that one who refuses to purchase has suffered sufficiently direct injury to challenge a tying arrangement. *Warner Management Consultants v. Data General Corp.*, 545 F.Supp. 956, 965 (N.D.Ill. 1982); *Ware v. Trailer Mart, Inc.*, 623 F.2d 1150 (6th Cir.1980).

C. *Irreparable injury.*

▪▪▪▪ Metromedia argues that FAME is the centerpiece of its new programming image for which there is no substitute, that it has been a door-opener to an important viewing audience of urban youth, and that FAME has become identified with Metromedia through a substantial advertising campaign. Because of this it claims irreparable injury from loss of image, momentum and goodwill as well as revenue from spot sales and barter. MGM/UA contends that Metromedia's interest is only economic and that loss of viewers and injury to reputation are compensable in money damages.

I do not believe that irreparable injury has been shown. First, Metromedia's existence is not threatened in any respect. Whatever its loss of revenue on account of an antitrust violation, or MGM/UA's failure to negotiate, is compensable in damages. *Cass Communications.* Second, the difference between advertising revenue

generated on FAME and a replacement is measurable. Metromedia has both a track record on FAME (as well as adjacent time periods), along with audience surveys and ratings, as a basis for comparison and calculation of loss. An even more direct basis for comparison will exist in the two markets in which there is overlap with Tribune. *See Capital Cities Communications, Inc. v. Twentieth Century Fox Film Corporation,* Slip Op. No. N–83–464 (D.Conn. 1983); *cf. Continental Distributing Co. v. Somerset Importers, Ltd.,* 411 F.Supp. 754 (N.D.Ill.1976) (no basis for comparison available); and *see Los Angeles Memorial Coliseum.* Third, while FAME (like all works of art) is unique and its loss may affect Metromedia's momentum, it also may not; taste, like FAME, is fleeting and there is nothing to show that a substitute may not catch on even more. To this extent the injury claimed is theoretical and not properly the basis for preliminary relief. *A.L.K. Corporation v. Columbia Pictures Industries, Inc.,* 440 F.2d 761 (3rd Cir.1971); *but see Courier Times, Inc. v. United Feature Syndicate, Inc.,* 300 Pa. Super. 40, 445 A.2d 1288 (1982) (irreparable injury on account of loss of unique product, "Peanuts," came from premier position assigned to "Peanuts" by the Inquirer in its effort to attract former Bulletin readers). Nor does it appear that loss of good will should be differently treated. In effect Metromedia has already placed a value on all of FAME (first runs and reruns) by the offer it made to MGM/UA. Finally, it has always been possible for Metromedia to lose FAME. At the end of either last season or this, MGM/UA could itself have decided not to produce new episodes. That being the case, Metromedia must have considered the risk worth taking, or put another way, not irreparable.

By the same token MGM/UA stands also to suffer, if the relief requested were granted. The Tribune sale would be lost and possibly also the property. Without support from syndicated reruns it may be unable to continue first run production. Some additional deference to possible harm to MGM/UA is indicated because Metromedia delayed seeking relief until the time for commitments for the 1985–86 season is imminent, despite the fact that the package to which objection is made was proposed in October, four months ago. *Capital Cities,* Slip. Op. at 9–10.

## CONCLUSION

Given the extraordinary nature of relief that is sought, the likely unenforceability of a right of first negotiation, the lack of a convincing showing that each of the constituent elements of an unlawful tying arrangement exists, the probable compensability of whatever injury is proved, and the potential for harm to MGM/UA as well, I cannot conclude that irreparable injury will occur or that the balance of hardships tips so sharply in Metromedia's favor that the requisite showing is made. Accordingly, plaintiff's motion for a preliminary injunction is denied.

Plaintiff's counsel shall arrange with defendants' counsel and the Court's clerk for a mutually convenient time for a status conference, to be held (either in Chambers or on the telephone) within seven days of the date of this Order.