AGNES H. PORTER, Appellant, *v.* COMMERCIAL CASUALTY INSURANCE COMPANY, Respondent.

Argued January 4, 1944; decided March 2, 1944.

*Joseph A. McCabe* and *Samuel R. Rosen* for appellant. I. Reformation of a contract is improper where mistake is unilateral and no fraud exists. To warrant reformation mistake must be mutual. (*Christopher St. R. Co.* v. *23d St. R. Co.*, 149 N. Y. 51; *Salomon* v. *North British & M. Ins. Co.*, 215 N. Y. 214; *Metzger* v. *Ætna Ins. Co.*, 227 N. Y. 411.) II. Evidence must be clear, positive and convincing before a contract can be rewritten by the court. Reformation is never granted upon a probability, nor even upon a mere preponderance of evidence, but only upon a certainty of the error. (*Salomon* v. *North British & M. Ins. Co.*, 215 N. Y. 214; *Susquehanna S. S. Co.* v. *Andersen & Co.*, 239 N. Y. 285; *Christopher St. R. Co.* v. *23d St. R. Co.*, 149 N. Y. 51; *Metropolitan Life Insurance Co.* v. *Tannenbaum*, 156 Misc. 221; Pomeroy's Equity Jurisprudence, 4th ed., § 859; *People* v. *Rodawald*, 177 N. Y. 408.)

*James Conboy* and *J. Stanley Carter* for respondent. I. The defendant is entitled to have the rider corrected so as to express the real intentions of the parties. (*MacDonald* v. *Crissey*, 215 N. Y. 609; *Born* v. *Schrenkeisen*, 110 N. Y. 55; *Pitcher*

v. *Hennessey,* 48 N. Y. 415; *Bacot* v. *Fessenden,* 139 App. Div. 647; *Haviland* v. *Willets,* 141 N. Y. 35; *Kilmer* v. *Smith,* 77 N. Y. 226; *Lewitt & Co., Inc.,* v. *Jewelers' Safety F. Soc.,* 249 N. Y. 217; *Fleischman* v. *Furgueson,* 223 N. Y. 235.) II. A reasonable construction of the language used in the rider and the history and background and intention of the parties in connection with the group plan of insurance does not justify a conclusion that the period of disability was to be extended beyond twelve months. (*Clausen* v. *Title Guaranty & Surety Co.,* 168 App. Div. 569, 222 N. Y. 675; *Evansville Nat. Bank* v. *Kaufman et al.,* 93 N. Y. 273; *Insurance Co.* v. *Dutcher,* 95 U. S. 273; *Woolsey* v. *Funke,* 121 N. Y. 87; *Fleischman* v. *Furgueson,* 223 N. Y. 235; *B. E. S. R. R. Co.* v. *B. S. R. R. Co.,* 111 N. Y. 132; *Manson* v. *Curtis,* 223 N. Y. 313.)

CONWAY, J. The plaintiff was employed in 1936 as a dining room attendant in the Wassaic State School. After her employment she became a member of the New York State Civil Employee's Association, hereinafter referred to as " Association ". The defendant, Commercial Casualty Insurance Co., hereinafter referred to as " Company ", made an agreement under which, upon application of a member, it issued a policy of accident and health insurance under what is described in the record as a group plan as distinguished from a group insurance policy. The group plan was not introduced into evidence. Two members of the insurance committee of the Association and two employees of the Company testified to the substance of the plan. Under it there were two classifications of policies issued by the Company. Class A policies were issued to employees in nonhazardous occupations and provided coverage for all illnesses and accidents both occupational and nonoccupational. Class B policies were issued to employees engaged in hazardous occupations and provided coverage for all illnesses and for nonoccupational accidents.

There was introduced in evidence the application by plaintiff for the original policy issued to her. That policy was a Class A policy. On the back of the application there appeared a short " Explanation Class A and Class B ". That explanation showed that indemnity was paid for sickness and accident under policies of Class A and Class B " for twelve months for any accident." No reference there is made to a policy issued under a Class B-2

classification and it is about a policy issued under that classification that the controversy here revolves. It arose in the following manner. The plaintiff ceased to be a dining room attendant and became a night cook and thus entered upon a hazardous rather than a nonhazardous employment. The policy in classification A which had been issued to plaintiff as a dining room attendant made no reference to any classification. It undertook to insure the plaintiff an " attendant by occupation " for a definite premium. Insofar as is here material, it insured against " loss or disability resulting directly and exclusively of all other causes, from accidental Bodily injury sustained during the life of this policy  *  *  * " for a period not exceeding fifty-two consecutive weeks.

Under the title, " Standard Provisions " it was provided: " 1. This policy includes the endorsements and attached papers, if any, and contains the entire contract of insurance. No reduction shall be made in any indemnity herein provided by reason of change in the occupation of the Insured or by reason of his doing any act or thing pertaining to any other occupation." The policy also provided for an accidental death, dismemberment and loss of sight benefit in the principal sum of $1,000 or aliquot part thereof.

There was no requirement in that policy under which a change in occupation from a nonhazardous to a hazardous one required reclassification of plaintiff's policy from an A to a B policy. On the contrary, however, there was a provision among the " Standard Provisions " which read as follows: " If the Insured shall at any time change his occupation to one classified by the Company as *less hazardous* than that stated in the policy, the Company, upon written request of the Insured and surrender of the policy, will cancel the same and will return to the Insured the unearned premium."

It was necessarily conceded in testimony offered by the Company on the trial that under that " Standard Provision " the plaintiff could have changed her occupation to cook and still continued under the policy; that if she had suffered the injury, which is the subject of this litigation, she could have recovered under it; that the only difference between the original A policy and the present so-called B-2 policy is that disability under the former would entail payments by the Company for only twelve months.

At the time of the issuance of the Class A policy to plaintiff the Company had not conceived or formulated a Class B-2 policy. It was not until January 1939, that the Company made " provision whereby an employee whose duties were *hazardous* could obtain the benefits of an A classification by paying an additional premium." The principal sum of the policy was thereupon reduced to $500. There is testimony in the record that that latter was the sum provided for in a Class B policy but there is no basis for such statement in the application signed by plaintiff for the original policy nor in the explanation on the reverse side of it, to which reference has already been made.

When plaintiff became a night cook, in January, 1939, she spoke to a Mrs. Murtagh who handled the business of the group plan policies for those employed in the Wassaic State School although she was employed by the State and not by the Company. Plaintiff asked " for a rider to the policy " because " the danger was very much greater working with the steam cooking, and the compensation which you get under accident is only two-thirds of your original salary." There was no conversation between the plaintiff and Mrs. Murtagh about any change or extension in the period of disability. There was no conversation about any reduction in death, dismemberment and loss of sight benefit. At the request of Mrs. Murtagh, who wrote to the Company for a B-2 rider, the Company prepared and returned a rider by which the policy classification was changed from A to B, the premium increased and the accidental death benefit (sic) reduced to $500. Up to that point the change was from an A policy to a conventional B policy except for the reduction in accidental death benefit. Over and beyond that, however, in order to supply insurance coverage against occupational accident the rider contained the following paragraph: " It is also understood and agreed that in consideration of the payment of an additional premium of Ninety Five Cents ($.95) quarterly, this policy is *hereby extended to cover any period of incapacity* caused by accident only for which the employee is entitled to indemnity or compensation under any Workmen's Compensation Act." (Emphasis supplied.)

Thus the new policy as written was a Class B policy with an increase of premium because of the change from nonhazardous to hazardous occupation but in addition there was a second and

further premium increase and the additional coverage just quoted. There was no form of printed rider for this change; it was typed for this risk. There was a printed form of rider to change a policy from Class A to Class B which contained no reduction in accidental death, dismemberment and loss of sight benefit. The additional charge and the additional coverage beyond what was granted by the attachment of a so-called B rider to a Class A policy caused the rider to be termed a Class B-2 rider. It was a coverage beyond that contemplated by the Class A and Class B policies as explained on the back of plaintiff's application in 1937. ·

When the rider was returned Mrs. Murtagh told plaintiff that "she didn't understand it very much herself but she guessed it was all right" and for plaintiff to read it very carefully before she accepted it. The latter testified that she read it carefully, understood its provisions and accepted them in writing. The rider was thereafter countersigned by the Company and forwarded to her.

In May, 1940, plaintiff suffered bodily injuries from an occupational accident. She has been disabled since. Concededly, within the terms of the policy as written, the Company is obligated to pay the sum sought in the complaint which includes payments for a period beyond the first year of disability. The ' Company concedes that the injury suffered was the result of an occupational accident and that plaintiff is "entitled to indemnity or compensation" under Workmen's Compensation Law. When this action was brought, however, the Company counterclaimed for reformation upon the ground that there had been a mutual mistake of fact in that neither party to the insurance contract intended to increase the period for which the Company had contracted to make disability payments under the Class A policy originally issued. There is no question here of fraud. The Trial Justice and the Appellate Division rejected such a contention. Reformation must therefore depend upon clear and convincing proof that both parties to the contract sued upon entered into it through mistake. The burden of proving a mutual mistake was upon the Company and, since this was a written instrument, it was necessary for it to establish that the plaintiff was mistaken by evidence of the clearest and most satisfactory character. (*Southard* v. *Curley,* 134

N. Y. 148; *Susquehanna S. S. Co.* v. *Andersen & Co.,* 239 N. Y. 285, 296, 297; *Christopher St. R. Co.* v. *23rd St. R. Co.,* 149 N. Y. 51, 58; *Salomon* v. *North British & M. Ins. Co.,* 215 N. Y. 214, 217; *Metzger* v. *Ætna Ins. Co.,* 227 N. Y. 411; 3 Pomeroy's Eq. Juris. [5th ed.] § 859a). In the *Christopher St. R. R. Co.* case, it was said: " To enable the plaintiffs to maintain this action, it was incumbent upon them to show that there was a mistake, that it was mutual and one made by all the parties to the agreement, so that the intention of neither was expressed. * * * In an action for the reformation of a written instrument upon the ground of mistake, the party seeking reformation must prove that there was a mistake by evidence that is clear, positive and convincing. It is to be presumed that the written instrument was carefully and deliberately prepared and executed and, therefore, is evidence of the highest character and will be regarded as expressing the intention of the parties to it until the contrary appears in the most satisfactory manner." We shall assume that the agent of the Company made a mistake and that the Company did not intend to extend payments for disability due to occupational accident beyond fifty-two weeks. There is no evidence that the plaintiff was in any way mistaken in accepting a policy which gave her a more extended coverage. What the plaintiff sought, as is the case with the average insured, was the best and most extended coverage that she could obtain from the Company with which she was dealing. She was a night cook in a State institution and not one versed in insurance. She was not required under the terms of the Class A policy to change to a Class B policy by reason of her change to a hazardous occupation as we have indicated in the quotation from the " Standard Provisions " (*supra*). The plaintiff did not seek a reduction in accidental death benefit when she asked for insurance covering occupational accident. The Company simply reduced it without consulting plaintiff and she accepted that just as she accepted the extended coverage which the Company wrote for her also without consulting her as to phraseology. The Company made a mistake. The plaintiff made none.

It was sought by the Company to probe the recesses of plaintiff's mind so as to establish that she must have known that the Company, despite its preparation of written words to the

contrary, never *intended* to increase the number of payments it would make in the event of her disability due to occupational accident beyond those provided for in the A policy. That was attempted by showing that plaintiff was present at the school when the plan was discussed before it went into effect; that she knew that her policy was issued under the group plan to members of the Association; that the original policy was in the A classification; that thereunder payments of disability were limited to a period of fifty-two weeks; that after the group plan was adopted, the Association published the plan in the April, 1937, and the September, 1937, issues of the monthly magazine. There is nothing in the record to show that plaintiff had any knowledge that the policies issued under the plan were all limited to a period of fifty-two weeks. She testified that at the time the original policy was issued she knew nothing about the B classification. Even assuming that she did, there is nothing in the record to show that she could have known in 1937 what a B-2 classification, mistakenly worked out in 1939 in the office of an agent of the Company, was to be or was to mean.

That is important because we have here a *written agreement* prepared by one party to it and accepted by the other. *It was prepared by the one seeking its reformation.* The Company assented to that agreement only after plaintiff had accepted in writing its offered phrasing and terms. That was the written statement of the Company's intent. What is in the mind of parties to a contract is evidenced by word or deed and must be determined therefrom. We find in the Year Books: "It is a trite learning that the thought of man is not triable, for the devil himself knows not the thought of man." (Brian, in YB 17 Edw. IV, 2.) We quoted with approval in *Sokoloff* v. *National City Bank* (CARDOZO, J.), 239 N. Y. 158, 170, the following from HOLMES, J., in *O'Donnell* v. *Clinton* (145 Mass. 461): "Assent, in the sense of the law, is a matter of overt acts, not of inward unanimity in motives, design, or the interpretation of words." (See to the same effect Williston on Contracts, Vol. 1, §§ 22, 94; Vol. V, § 1535-7.) In 1 Williston, section 22, it is said: "It is customarily said that mutual assent is essential to the formation of informal contracts, but it should further be stated that the mutual assent must be manifested by one party to the other,

and except as so manifested is unimportant. In some branches of the law, especially in the criminal law, a person's secret intent is important, but in the formation of contracts it was long ago settled that secret intent was immaterial, only overt acts being considered in the determination of such mutual assent as that branch of the law requires." In *Hotchkiss* v. *National City Bank of New York* (L. HAND, J.), (200 F. 287, 293, affd. 231 U. S. 50), it was said: " A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake, or something else of the sort. Of course, if it appear by other words, or acts, of the parties, that they attribute a peculiar meaning to such words as they use in the contract, that meaning will prevail, but only by virtue of the other words, and not because of their unexpressed intent."

So here the plaintiff carefully read, as she was told to do, the language used by defendant in preparing its contract. She knew what was in the mind and what was the intention of the Company because that was evidenced in words used by the Company in preparing the contract. The Company told her the content of its mind and the limits of its intention. The plaintiff could determine the Company's intent in no other manner. She was making no mistake. She knew what was offered and she accepted. She accepted the additional benefit, she undertook to pay an increased and an additional premium and consented to the halving of her accidental death benefit.

The judgment of the Appellate Division should be reversed and that of the Special Term affirmed, with costs in this court and in the Appellate Division. (See 292 N. Y. 717.)

LEHMAN, Ch. J., LOUGHRAN, RIPPEY, LEWIS, DESMOND and THACHER, JJ., concur.

Judgment accordingly.