**TOM DOHERTY ASSOCIATES INC.,**
**d/b/a TOR Books, Plaintiff,**

v.

**SABAN ENTERTAINMENT INC.,**
**and Saban International NV,**
**Defendants.**

**No. 94 Civ. 5836 (LMM).**

United States District Court,
S.D. New York.

Nov. 28, 1994.

Gregory L. Diskant, Patterson, Belknap, Webb & Tyler, New York City, for plaintiff.

Max Gitter, Aidan Synnott, Lynn B. Oberlander, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants.

## MEMORANDUM AND ORDER

McKENNA, District Judge.

Plaintiff, TOR Books ("TOR"), brought this action against defendants, Saban Entertainment Inc. and Saban International NV (together "Saban"), for breach of contract. On August 11, 1994, TOR moved for a preliminary injunction requiring Saban to offer TOR the right to publish juvenile story books based on the Mighty Morphin Power Rangers ("Power Rangers"), prohibiting Saban from licensing or facilitating the publication of books based on the Power Rangers (except coloring, comic or activity books), and

prohibiting Saban from licensing the publication of juvenile story books based on other Saban properties unless TOR is first offered the right to publish such books. After expedited discovery, the Court held an evidentiary hearing. For the reasons stated below, TOR's motion is granted in part and denied in part.[1]

## I.

### The Parties

TOR, a wholly owned subsidiary of St. Martin's Press, is a major publisher of fantasy and science fiction books for adults. TOR is also a relatively minor publisher of children's books. Saban is the creator, producer, and distributor of video entertainment for children. In 1991, seeking to find a publisher for children's books featuring its characters and stories, Saban approached TOR about entering into a long term arrangement. The parties' goals were compatible. Saban sought a publisher for "a line of juvenile picture books based on [its] characters." (Def.Mem. p. 7.) TOR sought the "publishing rights to properties that could anchor a line of juvenile books." (K. Doherty Aff. ¶ 3.)

The ensuing negotiations principally involved four individuals: L. Spencer Humphries, an outside consultant for Saban who originally suggested TOR as a potential publisher; William Josey, General Counsel for Saban; Kathleen Doherty, the director of Education Sales at TOR and the person in charge of its children's book publishing division; and Lotte Meister, associate general counsel for St. Martin's Press and TOR. Neither Josey or Meister, the two attorneys involved, had ever negotiated a licensing agreement for publication rights of children's books. (Meister Aff. ¶ 3; Tr. October 5, 1994 at 66.)

### The Contract

In December 1991, TOR and Saban entered into the agreement at issue, dated "as of" October 15, 1991 (the "Agreement"). The Agreement achieved two important objectives. First, TOR would immediately publish

---

1. As set forth below, at the conclusion of the hearing TOR modified its requests for relief. Direct testimony at the hearing was submitted in affidavit form, the affiants being subject to cross-examination.

six books based on Saban properties. Second, the Agreement contemplates the possible publication of further books in the future. It is clear from the evidence that the parties carefully negotiated the terms of the Agreement. The Court need look no further than the Agreement itself, which is an extensively marked-up version of TOR's standard Contract with Author.

Virtually the entire Agreement is concerned with the rights and obligations of the parties concerning the six titles TOR would publish immediately. However, the most significant provision of the Agreement for purposes of this motion is undeniably the rider to Paragraph 16 (the "Rider"). The Rider completely replaced TOR's standard option paragraph, and the evidence is undisputed that the Rider was the subject of intense negotiation and that several drafts were exchanged. In the end, the parties agreed that Saban would retain the initial right to decide whether to publish additional juvenile story books based on its properties. However, if Saban so desired, TOR would have an exclusive right of first refusal to be exercised within thirty days.

The Rider reads as follows:

During the Term of this Agreement, if [Saban] desires to license the publishing rights to additional juvenile story books based on characters, artwork and/or literary, television, motion picture or theatrical properties owned or controlled by [Saban], [Saban] shall submit such additional titles for [TOR's] consideration. [TOR] shall have a 30 day period in which to evaluate each such submission. If, upon conclusion of such 30 day evaluation period, [TOR] does not desire to license the publishing rights to such submission, subject to the rights therein controlled by [Saban], [Saban] shall have no further obligation to [TOR] with respect thereto and [Saban] shall be free to enter into any third party publishing arrangement in connection therewith; on the other hand, if [TOR] desires to license the publishing rights to such submission, then [Saban] and [TOR] shall enter into an agreement under which [Saban] agrees to create a juvenile story book (of approximately 2,500 words) on the same terms and conditions set forth in this Agreement except that if such book is based on a primetime network television series, a primetime network television special, a major motion picture or theatrical feature, [TOR] and [Saban] shall negotiate in good faith with respect to an appropriate advance in connection therewith.

The parties do not dispute the mechanics of the Rider's operation. The concern of the parties, and of this Court, is the meaning and scope of the phrase "juvenile story books". Does the term have any special meaning within the publishing industry? Did the parties intend for it to have some special narrow meaning? Or should the Court enforce the plain meaning of the words?

### The Industry

The Court's understanding of the children's book industry, based on the evidence adduced at the hearing, is perhaps best set out here. The industry can be conceived of as having two distinct segments. The first segment is concerned with the creation of characters and stories and consists of individual authors, toy manufacturers, television and movie studios, and others. The second segment consists of the publishing houses. There may, of course, be some overlap.

There is generally little complete agreement on terminology within the industry. Certain terms carry certain meanings, others do not. The Court finds specifically that the terms "categories", "formats", and "juvenile story books" have no uniform meanings. For purposes of this decision, however, the Court will use the word "format" to describe types of books with reference to their physical characteristics.

Children's books are published in a variety of shapes, sizes and reading levels. Each format is designed to appeal to a specific segment of the juvenile audience. Once it is decided that a book will be published, the parties must decide on the appropriate format or formats.

Some examples of individual formats are board books (made up of rigid cardboard "pages" with illustrations and including only the most limited text); 8 × 8 books (approximately eight inches by eight inches including

many illustrations and limited text of approximately a few hundred to some twenty-five hundred words); junior novelizations (text only or text with pictures interpaginated); shape books (books in the shape of a character or theme of the book); miniature books (books approximately two inches or less in height); and book and tape packages (an 8 × 8 packaged with an audio cassette). These formats however are not rigidly and exclusively defined. In the last analysis, a children's book can be published in any length or size or shape, with any amount of illustrations of any kind, and directed at any reading level.

Although it was not directly shown at the hearing, it can be inferred that the decision to publish a children's story in more than one format is directly related to the popularity of the property. A property with only limited appeal may well only be published in one format; but when a character explodes onto the juvenile consciousness, the creator can be expected to license the publishing rights in an extended line of formats. It is not uncommon in a multiple-format situation for the creator to distribute the licensing rights to more than one publisher, with each focusing on one or two formats. (Stine Aff. ¶ 10.) It can also be inferred that the 8 × 8 format is one of the most popular and successful.

### Initial Performance

The parties cooperated on the publication of the original six titles, and TOR has published or is in the process of publishing each of such books. Each was, or will be, published in the 8 × 8 format alone, and includes text of approximately 1000 words. Nevertheless, the parties agree that under the terms of the contract, TOR is the only publisher that can publish books *in any format* based upon the Saban properties underlying the six books (Tr. October 5, 1994 at 83–91).[2]

### The Power Ranger Phenomenon and the Alleged Breach

Saban's Mighty Morphin Power Rangers debuted on Saturday morning television in the Fall of 1993, and have become a lucrative merchandising property among children. To capitalize on the popularity of their characters, Saban has entered into a variety of licensing agreements with companies in various fields of children's merchandising, including children's book publishing. (Young Aff. ¶ 8.) Today, Power Ranger merchandise is available in an almost limitless variety of products. (*Id.* ¶ 6–8.)

Saban decided to license publishing rights to the Power Rangers sometime in 1993. Before proceeding to license any publishing rights, Saban's newly-hired director of licensing, Debi Young, reviewed all of Saban's existing agreements including the Agreement with TOR. (Tr. October 6, 1994 at 198–201.) Young discussed the TOR Agreement with Josey and the two determined that the Rider only covered children's books in the same format as those TOR was already publishing pursuant to the Agreement, namely 8 × 8. (*Id.* at 201, 215–16.) Having determined that Saban was free to license publication rights for any format other than 8 × 8, Saban entered into a number of licensing agreements with other publishing houses. At no time did Saban approach TOR about publishing any books in any format. (Tr. October 6, 1994 at 197–98.) Today, children's books featuring the Power Rangers are available in a variety of formats: a board book, a fold-out book, a scrap book, a hardcover book, a book and tape, a junior novelization, and a number of coloring books; and more are planned. (Young Aff. ¶¶ 6–7.)

There is some dispute as to when TOR, or anyone at TOR, first learned that Saban had licensed Power Ranger books. It is clear, however, that once Ms. Doherty learned that Saban had licensed publishing rights to the Power Rangers, many months passed before she first contacted someone at Saban regarding the Power Ranger books, and even longer before the parties discussed the possibility that Saban had breached the agreement. *See infra* pp. 1140–1141.

After negotiations to resolve this dispute broke down, Saban filed a complaint in California state court seeking a declaratory judg-

---

**2.** The Agreement expressly reserves to Saban the right to publish or license the publishing rights to "comic books, coloring books, and activity books." Rider to paragraph 9(e). Nothing in this opinion should be read to interfere with that right.

ment. TOR filed suit in this Court the next day. TOR's motion for a preliminary injunction, as modified at the evidentiary hearing, requests the following relief:

One, Saban be ordered not to license any further juvenile storybook rights to anyone for the Mighty Morpin [sic] Power Rangers without complying with the rider. That includes not signing contracts that are not yet signed. We understand the contract with Disney is still under negotiation. It includes if a contract has flexibility, such as the contract with Parachute says at least 4 books, wherever the contract has flexibility in which Saban doesn't have to provide more properties it should be ordered not to.

The order should recognize that Saban should have licensed these books to us in November 93, when it licensed them instead to third parties, and that as a result paragraph 21 in its exclusivity provision should have kicked in with the result that Saban should be ordered not to offer book rights of any sort to any third party with respect to the Mighty Morpin [sic] Power Rangers.

Saban should be ordered to comply with Rider 16 for its other entertainment properties. We understand they are licensing or attempting to license rights to something called VR Troopers and Creepy Crawler. Saban should be enjoined from further publishing its so-called self published 8 by 8 book. It has no business doing that.

And then that leaves the contracts that are in place and we have two alternative suggestions with respect to them.

First, we propose that we hold what, in effect, is an inquest; that we take discovery of these third-party publishers to determine the extent to which they are involved in Saban's scheme and are culpable and are appropriate subjects for injunctive relief and have a hearing on it.

Alternatively, we request that the court set an expedited trial date for the full trial on the merits. I think there is very little remaining of this dispute. We have had expedited discovery. The principals' depositions have been taken. I think we can go to trial on the merits in 3 months and do just fine.

(Tr. October 11, 1994 pp. 38–39.) Significantly, TOR no longer seeks to interfere with existing licensing arrangements.

## II.

The Court will only grant a preliminary injunction when plaintiff can demonstrate irreparable harm, and "either (1) a likelihood of success on the merits of its case or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990).

### A.

■ TOR has demonstrated that it will suffer irreparable harm unless Saban is ordered to license to it publishing rights to Power Ranger books.

■ Irreparable harm is a sine qua non to the issuance of a preliminary injunction. *Truglia v. KFC Corp.*, 692 F.Supp. 271, 280 (S.D.N.Y.1988), *aff'd mem.*, 875 F.2d 308 (2d Cir.1989). The moving party must show that the injury is imminent, not speculative, and "one incapable of being remedied by monetary damages." 903 F.2d at 907. If the party can be fully compensated with damages, then equitable relief is unnecessary.

■ The loss of the opportunity to distribute and market a commodity may constitute irreparable harm. *Reuters*, 903 F.2d at 907–08; *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197 (2d Cir.1970). Where the property is unique, injunctive relief is appropriate. *Conway v. White*, 9 F.2d 863, 866 (2d Cir.1925) ("It is of course well-settled law that a contract to sell or transfer a patented right, like a contract to sell real estate, may be specifically enforced. The reason is that there is no accurate measure of damages, and a pecuniary payment is inadequate relief."). *See also*, Restatement (Second) of Contracts § 357 illustration 1 (1986); *American Brands, Inc. v. Playgirl, Inc.*, 498 F.2d 947 (2d Cir.1974).

In *Reuters,* United Press International ("UPI") moved for a preliminary injunction compelling Reuters to continue supplying foreign news pictures and stories to UPI. 903 F.2d at 905. The Second Circuit noted that UPI's situation was similar to "cases where a preliminary injunction has issued to prevent a product source from suspending delivery to a distributor, the irreparable harm has often consisted of the loss of customers and *the competitive disadvantage* that resulted from a distributor's inability to supply its customers with the terminated product." *Id.* at 909 (emphasis added).

In *Semmes,* the Second Circuit ordered the Ford Motor Company to resume supplying automobiles to a father and son dealership with whom Ford had dealt for twenty years. 429 F.2d at 1205–06. The Court noted: "[plaintiffs] want to sell automobiles, not to live on the income from a damages award." *Id.* at 1205.

Saban is quite right in pointing out that these cases are distinguishable and that in other cases courts in this circuit and others have refused to order a preliminary injunction in similar situations. *See, e.g., Jack Kahn Music Co. v. Baldwin Piano & Organ,* 604 F.2d 755 (2d Cir.1979); *Metromedia Broadcasting Corp. v. MGM/UA Entertainment Co.,* 611 F.Supp. 415 (C.D.Cal.1985).

In *Kahn,* the supplier of a well-known brand of piano terminated a contract with a local dealership. The Second Circuit, in reversing the grant of a preliminary injunction, noted that there was

> absolutely no evidence suggesting that the loss of the Baldwin line will result either in various customers abandoning Kahn for other dealers who can provide a full range of services or with Kahn unable to fill outstanding orders for Baldwin instruments. Cutting through the morass of unsupported allegations of irreparable damage, the essence of Kahn's claim is for the loss of the alleged profitable business of selling Baldwin pianos, organs and other musical instruments. There is no doubt than any such loss is provable.

604 F.2d at 763.

In *Metromedia,* the supplier of the television program FAME refused to continue supplying the program to Metromedia, an affiliation of local stations. 611 F.Supp. 415. "Metromedia argue[d] that FAME is the centerpiece of its new programming image for which there is no substitute, that it has been a door-opener to an important viewing audience of urban youth, and that FAME has become identified with Metromedia through a substantial advertising campaign." *Id.* at 426. In denying injunctive relief, the court wrote: "while FAME (like all works of art) is unique and its loss may affect Metromedia's momentum, it also may not; taste, like FAME, is fleeting and there is nothing to show that a substitute may not catch on even more." *Id.* at 427.

■ These cases demonstrate that the determination to grant injunctive relief when a source refuses to supply a commodity is necessarily fact sensitive. The issue can be resolved by asking whether the plaintiff seeks something more than lost profits.

TOR does seek something more than lost profits. It seeks the opportunity to establish itself in the children's publishing industry as a reputable and responsible publisher of books. There could be few better opportunities than as the exclusive publisher of Power Rangers books. Saban argues that the harm is not irreparable because the Power Rangers are not unique. The Court disagrees. The Power Rangers belong to that rare and unpredictable species of wildly successful children's cult heroes. No one in or out of the industry can predict when or where the next such success will arise. Further, the Power Rangers are a unique opportunity for TOR. As a relative unknown and unproven entity in the industry, TOR could not realistically expect to see any part of the licensing of such an established hit. All that TOR could do, as it did, was to hitch its fortunes to a hopefully rising star, and hope that it guessed right.

There is no dispute that TOR was unknown and unproven in the industry. Saban's expert testified that TOR "does not have a prominent reputation as a publisher of juvenile books;" "I had never heard of or seen any children's books from TOR;" "TOR does not have a reputation for publishing

children's books." (Glassman Aff. ¶ 29.) Large publishing houses are rarely at a loss for new properties, although few properties are as lucrative as the Power Rangers. Minor publishers are differently situated. They may find it difficult throughout their existence to acquire licensing rights to *any* profitable properties, and can only dream of an opportunity to publish a "hot" property.

The fortunes and opportunities of an unknown publisher could not be illustrated more starkly than by the facts in this case. In 1991, TOR was having some difficulty finding properties to base books on and Saban was in search of a publisher for its properties. So the parties gladly cooperated.

By 1993, Saban, with the advent of the Power Rangers, had a major success. It no longer had any difficulty finding publishing outlets for its properties. TOR, on the other hand, has remained an insignificant stranger to Saban's success. TOR is still a relatively unknown and unproven commodity in the industry.

While the Court does not believe that either party, at the time they entered into the Agreement, considered the possibility of the publication of a line of books such as the Power Ranger line has become, the Court finds that TOR bargained for the right to publish such a line. It is undisputed that a future arrangement was important to TOR. The Rider was negotiated extensively and both parties sought to maximize their options under the agreement. In the end, the parties agreed to allow Saban to make the initial decision whether to go forward with the publication of additional books; but in that event, TOR would have the opportunity to be the exclusive publisher. At the time the Agreement was entered into, the parties were not dealing with a known situation; neither party could know whether the Rider would involve titles of a more ordinary kind or something like the Power Rangers. Saban can not be allowed to avoid the plain meaning of the Agreement simply because the property was more lucrative than either party could possibly have expected.

■ Saban also argues that the Court should not award preliminary relief when the alleged harm is speculative. *See e.g., New York v. Nuclear Regulatory Comm'n*, 550 F.2d 745, 755 (2d Cir.1977); *Kaplan v. Board of Educ. of the City Sch. Dist.*, 759 F.2d 256, 259 (2d Cir.1985). For the reasons discussed above, the Court finds that the alleged harm to TOR, although not quantifiable, is not speculative.

### B.

TOR has demonstrated a likelihood of succeeding on the merits.

■ The Court's ultimate objective in interpreting a written contract is to determine "the intention of the parties as derived from the language employed." *Hartford Accident & Indem. Co. v. Wesolowski*, 33 N.Y.2d 169, 171, 350 N.Y.S.2d 895, 305 N.E.2d 907 (1973). The intent of the parties is discovered in the language of the contract and the actions of the parties. *Porter v. Commercial Casualty Ins. Co.*, 292 N.Y. 176, 183, 54 N.E.2d 353 (1944). The secret intent of the parties is irrelevant to contract interpretation. *Id.* at 184, 54 N.E.2d 353.

> A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake, or something else of the sort. Of course, if it appear *by other words, or acts*, of the parties, that they attribute a peculiar meaning to such words as they use in the contract, that meaning will prevail, but only by virtue of the other words, and not because of their unexpressed intent.

*Hotchkiss v. National City Bank of New York*, 200 F. 287, 293 (D.C.N.Y.1911), L. Hand, J., *aff'd* 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913) (emphasis added).

■ In the absence of an ambiguity, it is for the Court to interpret the written

contract. *Hartford Accident*, 33 N.Y.2d at 172, 350 N.Y.S.2d 895, 305 N.E.2d 907. If the language in the contract is ambiguous, the parties may submit extrinsic evidence, and the resolution of the ambiguity is then a question of fact. *State v. Home Indem. Co.*, 66 N.Y.2d 669, 495 N.Y.S.2d 969, 971, 486 N.E.2d 827, 829 (1985). However, if the extrinsic evidence does not resolve the equivocality of the language, the issue remains one of law. *Id.* Whether there is ambiguity is necessarily a question for the court.

■ Properly framed, the issue here is whether the term "juvenile story books" in the Rider means all books with stories aimed at children, or a particular type of book, namely an 8 × 8 of approximately 1000–2500 words.

Although there is a plain meaning to the term "juvenile story books", the Court considers the extrinsic evidence offered by both parties. The plain meaning of the phrase is books with a narrative intended to be read by or to children. (Pl. Exhs. 245–46) (dictionary definitions of "storybook" and "story".) Although such a definition includes most formats of children's books, Saban has all but conceded that such is the term's plain meaning. (*See, e.g.,* Tr. October 6, 1994 at 207–211 (Debi Young, Saban's director of licensing, concedes that the term can be used broadly)). However, Saban has argued that there is an issue whether the parties intended the term to carry its plain meaning; Saban has offered several credible arguments. The Court takes each in turn. The burden is on Saban to prove a meaning different from the plain meaning of the words.

First, Saban has failed to show that the phrase "juvenile story books" is a term of art or that it carries a specific meaning in the industry. Although some of Saban's witnesses contended that the term referred specifically to an 8 × 8, others testified otherwise. Peter Glassman, who writes, edits and publishes children's books and who owns the largest independent children's bookstore in New York, stated in his affidavit: "The term 'juvenile story book' is not a term of art in the children's publishing trade as I know it." (Glassman Aff. ¶ 12.) Mr. Glassman also testified in court: "Q. [T]he term juvenile story book is a term that has no meaning, is that correct? A. Correct." (Tr. October 6, 1994 at 160.) Jane Stine, vice-president of Parachute Press stated in her affidavit: "['story book'] is essentially synonymous with a picture book, a book with up to a few thousand words, that is a combination of text and illustration" (Stine Aff. ¶ 11). Heather Alexander, the licensing director at Parachute Press, also testified that the term had no particular meaning: "Q. You recognize that different people in the trade use different terms when they say children's storybook? A. Obviously yes." (Tr. October 4, 1994 at 164.)

Even if the term carried a specific meaning in the industry, an industry term would not be relevant because the individuals involved in the negotiations had little or no understanding of the children's book industry, and were not contracting with reference to industry terms.

Second, Saban has failed to show that the language of the Agreement dictates a narrow interpretation of the phrase "juvenile story books" in the Rider. Paragraph 1 speaks only to granting TOR the right to publish "the Work" in "book form". Paragraph 3(a), setting forth Saban's agreement as to the manuscripts of the six books to be delivered to TOR for publication does, to be sure, refer to manuscripts of approximately 2500 words containing artwork from a Saban video or television series, but that paragraph represents the parties' intentions as to those six books only, and cannot be taken as a limitation on the language of the Rider. Paragraph 9(a) grants TOR certain "subsidiary rights", including the right to use the "Work" on microfilm and microfiche. Paragraph 9(b) specifies that Saban is to earn royalties from licenses granted by TOR for "English Language Book Publication Rights (*regardless of format*)." (Emphasis added.) Paragraph 13, expressly states that "publication will be in a format determined by [TOR] acting in its sole discretion."

Furthermore, the rider to paragraph 9(e) specifically preserves Saban's "right to publish and authorize the publication of comic books, coloring books and activity books based on the characters and/or stories on

which the work is based." That language suggests that Saban, understanding that the Agreement grants broad publishing rights, considered it necessary to preserve specific publishing rights. It certainly does not support Saban's argument that the parties always intended that TOR publish in only one format.

Paragraph 21, the non-competition paragraph, also gives some insight into the parties' intent. Paragraph 21 prohibits Saban from authorizing the publication of any other "book" based on the same characters or stories licensed to TOR. This language suggests that Saban was licensing juvenile storybook rights to the character or the story rather than merely a right to publish in one format; and provides that as far as any material licensed to TOR was concerned, TOR would be the only juvenile book publisher.

Third, Saban has not shown that the language of the Rider itself limits the meaning of "juvenile storybooks". Saban suggests that the word "additional", which modifies "juvenile story books", limits its meaning to more of the same type of book already being published by TOR, to wit 8 × 8s. The Court finds this argument strained. "Additional" can be read, and should be read, to simply mean more books, not more of the same type of books. If the parties actually intended to limit the scope of the Rider they could have done so very simply.

Saban also argues that the approximate word length appearing later in the Rider calling for Saban to provide a "juvenile story book (of approximately 2500 words)" defines the format of the book. This provision describes the manuscript that Saban is required to deliver to TOR if TOR accepts the right of first refusal provided for in the Rider; it does not, however, limit the meaning of "juvenile story books". The six books originally published by TOR are approximately 1000 words in length, well below the suggested word length. Neither party has suggested that any format of book was necessarily associated with a word length of 2500 words.

Fourth, Saban has failed to show that anyone at TOR or Saban intended that the term have the narrow meaning of an 8 × 8. Kathleen Doherty and Lotte Meister have both testified that they did not intend that the term have anything but its ordinary meaning. (K. Doherty Aff. ¶ 10; Meister Aff. ¶ 19.)

Fifth, Saban suggests that the meaning is defined by the course of dealing between the parties. In other words, because TOR published the original six titles only in the 8 × 8 format, that that was all the parties intended to publish in the future. However, the language of the contract belies that. The Agreement speaks of other formats, and Saban went so far as to expressly reserve its right to publish the property in coloring book, activity book, and comic book formats. The decision to publish the six books as 8 × 8s is just as easily explained as the only sound business decision for publishing six titles of admittedly limited appeal compared to the Power Rangers. Publication of a line of formats is the exception rather than the rule and is only triggered by the appropriate character or story.

Sixth, Saban suggests that William Josey's intent is dispositive. For the reasons discussed below, the Court does not believe that anyone associated with the Agreement considered the possible format of future books. Nevertheless, assuming the truth of Josey's statements, they would still not resolve the issue. Saban never showed that Josey communicated his belief to TOR. The unexpressed subjective intent of one party is not binding on the other. *Porter v. Commercial Casualty Ins. Co.*, 292 N.Y. 176, 184, 54 N.E.2d 353 (1944).

Seventh, Saban argues that no one in the industry would have conveyed the rights to publish books in all formats because the rights are normally distributed among more than one publisher. However nothing suggests that Josey was aware of any such practice at the time of the contract. He had never negotiated a children's publishing contract before.

Finally, Saban points to the actions of Kathleen Doherty after she learned of the publication of Power Ranger books. When Ms. Doherty finally contacted the people at Saban, she did not demand an explanation for Saban's breach of contract, but rather

simply discussed the possibility of TOR publishing 8 × 8s based on the Power Rangers. The Court believes that Ms. Doherty's actions do not reveal any insight into her or TOR's interpretation of the contract.· She is a publisher, not a lawyer; she may well not have remembered the contractual language in the Agreement, or she may not have appreciated its scope. (*See* K. Doherty Aff. ¶¶ 14–19.)

Much was made at the hearing of Kathleen Doherty's testimony both at the hearing and at her deposition. Saban established that much of her hearing testimony contradicted statements made earlier at the deposition. The Court finds the testimony given at the hearing as substantially credible.

It appears to the Court that in considering future properties and publishing projects, the parties simply never specifically contemplated a *line of books* in different formats. The parties were focused on who would decide to publish additional books featuring Saban characters, and never considered that Saban or TOR would seek to publish the books in different formats. (See Def.Mem. p. 12 ("The [Rider negotiations] had nothing to do with the *type* of book to which this Rider applies."))

The record demonstrates that the parties never considered this possibility. If they had, they would have dealt with the problem more clearly. There is no lack of appropriate language that would have explicitly defined the parties' rights in the present situation; the language chosen fails in that regard.

After considering all of the extrinsic evidence presented at the hearing, the Court finds that it is inconclusive. The issue then becomes one of law. It is axiomatic that, in the absence of evidence to the contrary, words in a contract carry their plain meaning. As discussed above, the term "juvenile story books" means books with narratives directed to children.

### C.

The final issue is whether TOR's delay in acting on the alleged breach constitutes laches and prevents this court from awarding equitable relief.

Saban first raised the laches defense in its brief in opposition to TOR's motion for a preliminary injunction. At the hearing, TOR modified its request for relief and no longer seeks to interfere with any existing licenses between Saban and other publishers. To the extent that the issue is not moot, the Court finds that TOR has not been diligent and the Court will not order relief that could have been avoided had TOR acted more promptly.

"To prove laches, the party asserting the defense must show (1) a lack of diligence by the party against whom the defense is asserted and (2) prejudice." *Southside Fair Hous. Comm. v. New York,* 928 F.2d 1336, 1354 (2d Cir.1991).

The evidence concerning TOR's delay was adduced at the hearing largely from the testimony of Kathleen Doherty. Ms. Doherty first heard of the Power Rangers in January 1994 when she was shown a copy of a Newsweek article discussing the phenomenal popularity of the characters and indicating that Saban was the creator. Ms. Doherty did not see the issue of Publishers Weekly appearing in February 1994 which carried both a TOR advertisement for Heidi and a Grosset and Dunlap advertisement for junior novelizations featuring the Power Rangers. Ms Doherty did become aware that someone, although she knew not who, was publishing books featuring the Power Rangers, in February 1994. However she did not attempt to contact anyone at Saban in February, March, or April of 1994. Sometime in late April or early May, Ms. Doherty learned definitively that Grosset and Dunlap had published a digest sized book featuring the Power Rangers. She did not call Saban for approximately two to three weeks, and when she did her calls were neither accepted nor returned. Her calls were fruitless as no one at Saban took her calls or called her back. On June 7, 1994, Ms. Doherty wrote to Elie Dekel at Saban, not to object to any violation of the Agreement, but simply to inquire about TOR publishing 8 × 8 books. Ms. Doherty saw Dekel at a licensing fair in mid-June, but again failed to mention any possible breach

of the Agreement. She did nothing until July while she waited for Dekel to call her. In July, Ms. Doherty met with her father and the general counsel of TOR's parent corporation, St. Martin's Press. (Tr. October 12, 1994 at 57–76.) It may have only been at this meeting that anyone at TOR actually began to understand that Saban may have violated the Agreement.

These actions constitute delay on the part of TOR. This delay allowed an extensive network of licensing rights to develop between Saban and third parties. Saban (and the third parties) would be prejudiced if the Court interfered with these licenses. There is nothing in the record to suggest bad faith on the part of Saban. The contract was inartfully drawn and each party interpreted its meaning favorably to itself. It can not be said that Saban intended in bad faith to breach the Agreement when it licensed publishing rights to parties other than TOR. Had TOR acted more quickly, the parties might have been able to resolve their differences and Saban might not have entered into the existing licensing arrangements. Given the absence of bad faith on Saban's part and TOR's lack of diligence, the Court will not interfere with existing licensing arrangements.

### III.

TOR has demonstrated a likelihood of succeeding on the merits. The Court has concluded that "juvenile story books" is a broad term encompassing most books with a narrative designed to appeal to children. Many of the books licensed by Saban fit within that definition. The junior novelizations published by Parachute Press are only the clearest example of Saban's breach. Because Saban has demonstrated its desire to license these books and has not offered TOR the rights, Saban has breached the Agreement.

The Court need not determine which books are covered by the Rider. The Rider provides that if Saban "desires to license the publishing rights to additional juvenile story books," which its actions have demonstrated it does, and offers the rights to TOR, which it should have, then paragraph 21 is triggered and Saban is prohibited from licensing other publishers to publish books, other than comic books, coloring books and activity books based on the Power Rangers. Therefore the issue is not which books are "juvenile story books" but rather which are expressly exempted by the rider to paragraph 9(e). Thus, if Saban licenses TOR to publish any books, then TOR must publish all books Saban desires to publish except for coloring books, comic books and activity books.

### Conclusion

TOR's motion for a preliminary injunction is granted to the extent set forth. The Court finds that when, in circumstances such as those in the present case, the supplier of a unique, lucrative, and possibly short-lived property refuses to supply that property in breach of a contract, the distributor is entitled to an injunction compelling performance.

Saban is enjoined:

(a) to offer to TOR the right to publish a juvenile story book based on the Power Rangers, as provided in the Rider;

(b) to offer to TOR the right to publish a juvenile story book based on any characters, artwork and/or literary, television, motion picture or theatrical properties owned or controlled by Saban if, during the term of the Agreement, Saban desires to license the publishing rights to a narrative designed to appeal to children based thereon; and

(c) from entering into any further licenses, or in any way expanding or extending any existing licenses, to any party other than TOR, of the right to publish any book based on the Power Rangers.

TOR's motion is otherwise denied. TOR's application for an expedited trial is denied. Submit order in accordance with above, with suggestions as to bond, on four days' notice.

SO ORDERED.